# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1209

_____

Thomas J. Gallagher; Joseph J. &ast;
Collins, Sr.; Dadder's Properties, LLC; &ast;
Dadder's Estates, LLC; Dadder's &ast;
Enterprises, LLC; Dadder's Holdings, &ast;
LLC; Troy Allison; Jeff Kubitschek; &ast;
Sara Kubitschek, &ast;
&ast;
      Plaintiffs - Appellants, &ast;
&ast; Appeals from the United States
    v. &ast; District Court for the
&ast; District of Minnesota.
Steve Magner, individually and as a &ast;
supervisor of City of St. Paul's &ast;
Department of Neighborhood Housing &ast;
and Property Improvement; Mike &ast;
Cassidy, individually and as a code &ast;
enforcement officer of the City of St. &ast;
Paul; Joel Essling, individually and as a &ast;
 code enforcement officer of the City of &ast;
St. Paul; Steve Schiller, individually &ast;
and as a code enforcement officer of the &ast;
City of St. Paul; Joe Yannarelly, &ast;
individually and as a code enforcement &ast;
officer of the City of St. Paul; Dennis &ast;
Senty, individually and as a code &ast;
enforcement officer of the City of St. &ast;
Paul; Michael Urmann, individually &ast;
and as a fire inspector of the City of &ast;
St. Paul; Andy Dawkins, individually &ast;
and as Director of City of St. Paul's &ast;
Department of Neighborhood Housing &ast;
 and Property Improvement; Randy &ast;

Kelly, individually and as Mayor of      *
City of St. Paul; John Doe; Jane Doe,     *
individually and in their official        *
capacities as code enforcement officers   *
 of City of St. Paul's Department of       *
Neighborhood Housing and Property          *
Improvement, law enforcement officers      *
or other officials or employees of the     *
City of St. Paul; City of St. Paul, a      *
municipal corporation,                      *
                                            *
        Defendants - Appellees,      *

_____

No. 09-1528

_____

Frank J. Steinhauser, III; Mark E.        *
Meysembourg; Kelly G. Brisson,             *
                                           *
        Plaintiffs - Appellants,       *
                                           *
    v.                                  *
                                           *
City of St. Paul, a municipal             *
corporation; Randy Kelly, individually    *
and as Mayor of City of St. Paul; Andy    *
Dawkins, individually and as Director     *
of City of St. Paul's Department of       *
Neighborhood Housing and Property         *
Improvement; Lisa Martin, individually    *
and as a code enforcement officer of      *
City of St. Paul's Department of          *
Neighborhood Housing and Property         *
Improvement; Steve Magner,                *
individually and as a supervisor of City  *

of St. Paul's Department of        *
Neighborhood Housing and Property    *
Improvement; Dean Koehnen,        *
individually and as a law enforcement    *
officer of City of St. Paul; John Doe;    *
Jane Roe, individually and in their     *
official capacities as code enforcement   *
officers of City of St. Paul's Department *
of Neighborhood Housing and Property   *
Improvement, law enforcement officers   *
or other officials or employees of the    *
City of St. Paul,                     *
                                       *

        Defendants - Appellees.    *

_____

No. 09-1579
_____

Sandra Harrilal,                *
                                       *
        Plaintiff - Appellant,    *
                                       *
Bee Vue; Lamena Vue,       *
                                       *
        Plaintiffs,            *
                                       *
Steven R. Johnson, doing business    *
as Market Group and Properties,    *
                                       *
        Plaintiff - Appellant,    *
                                       *
      v.                      *
                                       *
Steve Magner, individually and as a   *
supervisor of City of St. Paul's       *

Department of Neighborhood Housing     *
and Property Improvement; Michael     *
Kalis, individually and as a code     *
enforcement officer of City of St. Paul;     *
Dick Lippert, individually and as a code     *
enforcement officer of the City of St.     *
Paul; Kelly Booker, individually and as     *
a code enforcement officer of the City     *
of St. Paul; Jack Reardon, individually     *
and as a code enforcement officer of the     *
City of St. Paul; Paula Seeley,     *
individually and as a code enforcement     *
officer of the City of St. Paul; Lisa     *
Martin, individually and as a code     *
enforcement officer of the City of St.     *
Paul; Dean Koehnen, individually and     *
as a law enforcement officer of the City     *
of St. Paul; Andy Dawkins, individually     *
and as Director of the City of St. Paul's     *
Department of Neighborhood Housing     *
and Property Improvement; Randy     *
Kelly, individually and as Mayor of the     *
City of St. Paul; individually, jointly     *
and severally; John and Jane Doe,     *
individually and in their official     *
capacities as code enforcement officers     *
of the City of St. Paul's Department     *
of Neighborhood Housing and Property     *
Improvement, law enforcement officers     *
or other officials or employees of the     *
City of St. Paul; City of St. Paul, a     *
municipal corporation,     *
    *
        Defendants - Appellees.     *

_____

Submitted: February 11, 2010
Filed: September 1, 2010
_____

Before WOLLMAN, BYE, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

Several owners and former owners of rental properties in St. Paul, Minnesota brought these consolidated actions, challenging the City of St. Paul's ("the City") enforcement of its housing code. The property owners appeal the district court's (1) dismissal of their claims on summary judgment, (2) denial of sanctions for spoliation of evidence, and (3) denial of discovery regarding Appellee Steve Magner. We affirm in all respects except the dismissal of Appellants' disparate impact claim under the Fair Housing Act.

## I.    Background

In 1993, the City enacted the Property Maintenance Code ("the Housing Code"), which "[e]stablishes minimum maintenance standards for all structures and premises for basic equipment and facilities for light, ventilation, heating and sanitation; for safety from fire; for crime prevention; for space, use and location; and for safe and sanitary maintenance of all structures and premises." St. Paul, Minn. Code § 34.01(1). Sometime shortly before or during 2002, the City established the Department of Neighborhood Housing and Property Improvement ("DNHPI") as an executive department responsible for administering and enforcing the Housing Code. DNHPI was empowered to inspect all one- and two-family dwellings and administer and enforce laws regulating maintenance of residential property.

Appellee Andy Dawkins was the director of DNHPI from 2002 to 2005. In that position, Dawkins favored owner-occupied housing over rental housing "for the sake

of the neighborhood[.]" Toward that end, Dawkins increased the level of Housing Code enforcement targeted at rental properties. In addition to responding to citizen complaints about particular properties, DNHPI inspectors conducted proactive "sweeps" to detect Housing Code violations. Furthermore, Dawkins raised inspection standards by directing DNHPI inspectors to "code to the max," that is, writing up every violation—not just what was called in—and writing up all the nearby properties—not just the reported properties. Lastly, DNHPI instituted a user-friendly system for inspectors and observers to report Housing Code violations. Dawkins expected that this vigilance would help DNHPI raise an additional $500,000 in revenue, which would cover the costs of additional inspections.

Under Dawkins' leadership, DNHPI also increased its Housing Code enforcement efforts regarding so-called "problem properties." The DNHPI website defined a problem property by saying: "If you live next door to a problem property you know it! Constant calls to get rid of the junk, intolerable behavior by occupants and guests, etc." DNHPI sought to compel property owners to take greater responsibility for their properties or, alternatively, force changes in ownership. To achieve its objectives, DNHPI employed a variety of strategies for renter-occupied dwellings, including orders to correct or abate conditions, condemnations, vacant-building registration, fees for excessive consumption of municipal services, tenant evictions, real-estate seizures, revocations of rental registrations, tenant-remedies actions, and if necessary, court actions. DNHPI coordinated its efforts with the St. Paul police and an assistant City attorney.

In addition, the City used a procedure known as "Code Compliance Certification" to require rental properties to meet current housing and building standards. The contours of this procedure are unclear, but it appears that the City required rental property owners to acquire Code Compliance Certification if a property was remodeled or deemed a dangerous structure, a nuisance building, or vacant. Code Compliance inspections were conducted by the City's Office of License,

Inspections, and Environmental Protection, which would evaluate the building's structure, plumbing, electrical condition, and mechanical condition. Code Compliance Certification allegedly forced property owners to undertake expensive renovations, especially with regard to older properties that were exempt from current building codes under Minnesota law.

Appellants own or formerly owned rental properties in the City. Appellants' individual rental portfolios ranged from one property to over forty properties. They rented primarily to low-income households, and a majority of their tenants received federal rent assistance. The parties agree that African-Americans generally made up a disproportionate percentage of low-income tenants in private housing in St. Paul, and specifically, Appellants claim that they rented to a higher-than-usual percentage of African-Americans.

Appellants' properties were subject to the City's Housing Code enforcement from 2002 to 2005. They received code enforcement orders that, in many cases, cited between ten and twenty-five violations per property for conditions including rodent infestation, missing dead-bolt locks, inadequate sanitation facilities, inadequate heat, inoperable smoke detectors, broken or missing doors and screens, and broken or missing guardrails or handrails. Several of Appellants' properties were designated as problem properties, subject to Code Compliance Certification, or, in a few cases, both. As a result of the City's Housing Code enforcement, Appellants suffered increased maintenance costs, fees, condemnations, and were forced to sell properties in some instances.

In 2004 and 2005, Appellants filed these actions against the City, the City's mayor (Randy Kelly), the City's fire inspector (Michael Urmann), a police officer who worked with DNHPI (Dean Kohnen), and several DNHPI employees, including

-7-

Dawkins, a supervisor (Steve Magner), and several code enforcement officers.[1] We refer to Appellees collectively as "the City" unless specification is warranted. Appellants' legal claims and the relevant facts are described in greater detail below.

The district court consolidated Appellants' actions and resolved them together. The court referred several discovery matters to a magistrate judge, including Appellants' motion and renewed motion for sanctions due to the City's alleged discovery abuses and Appellants' motion to compel discovery of Steve Magner's personal records. The magistrate judge denied both of those motions, and the district court affirmed. Then, the City moved for summary judgment. After a hearing, the district court granted the City's motion for summary judgment in its entirety. Appellants challenge the summary judgment order, the denial of spoliation-of-evidence sanctions, and the denial of discovery regarding Magner's personal records.

## II.    Summary Judgment

"We review a decision to grant summary judgment de novo, applying the same standard as the District Court." Riley v. Lance, Inc., 518 F.3d 996, 999 (8th Cir. 2008). We will affirm if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). We view the facts in the light most favorable to Appellants, drawing all reasonable inferences in their favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

---

[1]The named code enforcement officers are: Mike Cassidy, Joel Essling, Steve Schiller, Joe Yannarelly, Dennis Senty, Lisa Martin, Michael Kalis, Dick Lippert, Kelly Booker, Jack Reardon, and Paula Seeley. Appellants do not appeal the district court's dismissal of their claims against two unnamed code enforcement officers.

## A.    Fair Housing Act

The Fair Housing Act ("FHA") prohibits property owners and municipalities from blocking or impeding the provision of housing on the basis of race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(a)–(b). Appellants argue that summary judgment was inappropriate because there is sufficient evidence to support their claims under the following theories: disparate treatment, disparate impact, retaliation, and failure to affirmatively further fair housing. We address each theory in turn.[2]

### (1)    Disparate Treatment

Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims. Ring v. First Interstate Mortgage, Inc., 984 F.2d 924, 926 (8th Cir. 1993) (applying the three-stage Title VII analysis to a FHA disparate treatment claim). The standard is familiar—did the defendant(s) treat the plaintiff(s) less favorably than others based on their race, color, religion, sex or national origin? Appellants contend that the manner in which the City enforced its Housing Code was discriminatory. Specifically, Appellants allege that the City enforced the Housing Code more aggressively with regard to their properties because they rented to a disproportionately high amount of racial minorities, particularly African-Americans.

Proof of discriminatory purpose is crucial for a disparate treatment claim. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Summary judgment is warranted if the plaintiff cannot produce either (a) direct evidence of discriminatory intent or (b) indirect evidence creating an inference of discriminatory

---

[2]The district court concluded that Appellants have prudential standing to pursue a claim under the FHA, and the City does not challenge that holding on appeal.

intent under the <u>McDonnell Douglas</u>[3] burden-shifting framework. <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir. 2004); <u>see also</u> <u>East-Miller v. Lake County Highway Dep't</u>, 421 F.3d 558, 563–64 (7th Cir. 2005) (applying the "direct evidence" and <u>McDonnell Douglas</u> frameworks in the FHA context). The district court concluded that Appellants did not assert a claim under the <u>McDonnell Douglas</u> framework, and we agree. Presentation of the <u>McDonnell Douglas</u> framework on appeal raises new issues and is therefore not appropriate for our consideration. <u>See</u> <u>Cronquist v. City of Minneapolis</u>, 237 F.3d 920, 924–25 (8th Cir. 2001) (refusing to consider a mixed-motive discrimination theory because it was not presented to the district court); <u>Universal Title Ins. Co. v. United States</u>, 942 F.2d 1311, 1314 (8th Cir. 1991) (new issues are generally not considered on appeal). As such, we turn to whether there is direct evidence that discriminatory animus motivated the City's code enforcement actions.

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." <u>Griffith</u>, 387 F.3d at 736 (quotation omitted). "Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." <u>Twymon v. Wells Fargo & Co.</u>, 462 F.3d 925, 933 (8th Cir. 2006) (alteration, quotation marks, and citations omitted).

Appellants cite many statements that purportedly show the "discriminatory attitude" of Housing Code enforcement in the City. Nearly all of these statements are not direct evidence of racial discrimination because they have little or no connection to a DNHPI policy or action. <u>See</u> <u>id.</u> We limit our discussion to statements from people within DNHPI or connected to a DNHPI policy or action.

---

[3]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Appellant Steven Johnson alleges that code enforcement officer Lisa Martin and police officer Dean Koehnen made racially derogatory remarks about Johnson's African-American tenants (e.g., "The black plague come like roaches") when Johnson asked why the City was "coming after" his properties. The district court did not address Johnson's allegations, however, as Appellants failed to bring them to the court's attention. Indeed, the district court noted its frustration with "voluminous materials—four file boxes worth—submitted by Plaintiffs in opposition to Defendants' motions for summary judgment." Steinhauser v. City of St. Paul, 595 F. Supp. 2d 987, 1020 (D. Minn. 2008). The court explained that Appellants failed to "winnow out the relevant documents," and therefore "the burden of doing so fell to the Court." Id. Johnson's allegations about Martin and Koehnen were contained in a single paragraph of a thirty-page affidavit, among nearly 2,000 pages of record evidence. Appellants do not contest the district court's portrayal of how the evidence was presented to the district court. Given these circumstances, we decline to reverse on the basis of Johnson's allegations. See Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 715 (8th Cir. 2004) ("'Factual assertions that defeat a summary judgment,' however, 'cannot be presented for the first time to [an] appellate court, and only those matters properly before [the] district court for summary judgment consideration are subject to appellate review.'" (citation omitted)); see also Crossley v. Ga.-Pac. Corp., 355 F.3d 1112, 1113–14 (8th Cir. 2004) (per curiam) (affirming summary judgment because the plaintiff failed to designate specific facts as per Rule 56; he attached full transcripts from six depositions and argued that his claim could be understood only upon a full reading of the depositions); White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (per curiam) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.") (quotation omitted).

On several occasions, viewing the record most favorably to Appellants, Dawkins made statements that demonstrate his desire and intent to reduce the amount

of low-income tenants in the City. These statements merit our attention because of Dawkins' role within DNHPI. However, all of Dawkins' statements are facially race-neutral, and we have stated, "Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker." Twymon, 462 F.3d at 934. Appellants have failed to connect Dawkins' allegedly hostile attitude toward low-income tenants with discriminatory intent; merely calling these statements evidence of racial animus is not enough to create a genuine dispute of fact. See Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

Appellants also argue that discriminatory intent should be inferred from the City's knowledge that its actions would likely have a disproportionate impact on racial minorities. The Supreme Court discussed a similar theory in Village of Arlington Heights v. Metropolitan Development Corp., 429 U.S. 252 (1977). There, the court of appeals held that a city's zoning decision violated the equal protection clause of the Fourteenth Amendment, which required a finding of discriminatory intent, solely because the "ultimate effect" of the decision was racially discriminatory. Id. at 254. The Supreme Court explained that in some cases, "an important starting point" for determining discriminatory intent is whether an official action "bears more heavily on one race than another." Id. at 266 (quotation omitted). "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." Id. The Court explained that discriminatory impact alone is not determinative outside of "rare" cases where the pattern of discriminatory effect is "stark." Id. Ultimately, the Court held that an arguable disparate impact on racial minorities was insufficient to prove a discriminatory purpose. Id. at 269–71.

Applying the Arlington Heights analysis here, the evidence of a disparate impact on African-Americans, which we discus in greater detail in the next section,

is not so stark and unexplainable on other grounds to justify, on its own, an inference of discriminatory purpose. See Ricketts v. City of Columbia, Mo., 36 F.3d 775, 781 (8th Cir. 1994) ("[I]n only a few cases, where a facially neutral policy impacted exclusively against one suspect class and that impact was unexplainable on neutral grounds, has the impact alone signaled a discriminatory purpose."). The City's explanation, which has greater support in the record, is that DNHPI targeted properties occupied mostly by low-income tenants. Although racial minorities were disproportionately represented, those low-income tenants included people of all races. Such conduct may be actionable, but not under the rubric of disparate treatment. See id. ("When there is a rational, neutral explanation for the adverse impact and the law or custom disadvantages both men and women, then an inference of discriminatory purpose is not permitted.").

In sum, there is insufficient evidence to reasonably infer discriminatory intent. Accordingly, the district court properly granted summary judgment with regard to Appellants' disparate treatment claim under the FHA.

### (2)    Disparate Impact

As alluded to in the previous section, Appellants allege that the City violated the FHA because aggressive enforcement of the Housing Code had a disparate impact on racial minorities. We apply a three-step analysis to Appellants' disparate impact claim. First, Appellants must establish a prima facie case, which requires showing "that the objected-to action[s] result[ed] in . . . a disparate impact upon protected classes compared to a relevant population." Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth., 417 F.3d 898, 902 (8th Cir. 2005). Stated differently, Appellants "must show a facially neutral policy ha[d] a significant adverse impact on members of a protected minority group." Oti Kaga, Inc. v. S.D. Hous. Dev. Auth., 342 F.3d 871, 883 (8th Cir. 2003). Appellants are not required to show that the policy or practice was formulated with discriminatory intent. Huntington Branch, NAACP v.

Town of Huntington, 844 F.2d 926, 934–35 (2d Cir.), aff'd, 488 U.S. 15 (1988) (per curiam); Smith v. Anchor Bldg. Corp., 536 F.2d 231, 233 (8th Cir. 1976). If Appellants establish a prima facie case, the burden shifts to the City to demonstrate that its policy or practice had "'manifest relationship'" to a legitimate, non-discriminatory policy objective and was necessary to the attainment of that objective. Darst-Webbe, 417 F.3d at 902 (quoting Oti Kaga, 342 F.3d at 883). If the City shows that its actions were justified, then the burden shifts back to Appellants to show "a viable alternative means" was available to achieve the legitimate policy objective without discriminatory effects. Id. at 902–03.

The first component of Appellants' prima facie case is an identifiable, facially-neutral policy or practice. See Mems v. City of St. Paul, 224 F.3d 735, 740 (8th Cir. 2000). The district court interpreted Appellants' disparate impact claim as a challenge to the City's policy of enforcing the Housing Code instead of the Federal Housing Quality Standard ("HQS"), which applies to all rental properties that receive federal rent assistance. This interpretation was too narrow. Appellants have consistently challenged the City's aggressive Housing Code enforcement practices. The common denominator in Appellants' affidavits, allegations, and briefs is that the City issued false Housing Code violations and punished property owners without prior notification, invitations to cooperate with DNHPI, or adequate time to remedy Housing Code violations. Punishments included fines, evictions, condemnations, revocation of rental registrations, and the financial burden of Code Compliance Certification. Therefore, turning to the next step in the prima facie case, we evaluate whether the City's aggressive code enforcement resulted in a disparate impact on a protected class.

To demonstrate a disparate impact, Appellants have offered evidence supporting the following conclusions:

(a) <u>The City experienced a shortage of affordable housing.</u>  The City represented in its 2003 report to the U.S. Department of Housing and Urban Development ("HUD") that "the lack of affordable housing opportunities remains a major issue facing many Saint Paul lower income households, who are also protected class members," and that "27.6% of Saint Paul's lower income residents cannot find adequate affordable housing in the City."  Then, in 2005, the City estimated that 32% of the households in St. Paul had unmet housing needs (cost burdens, overcrowding, etc.).

(b) <u>Racial minorities, especially African-Americans, made up a disproportionate percentage of lower-income households in the City that rely on low-income housing.</u>  The district court noted that the parties agree that African-Americans make up a disproportionate percentage of low-income tenants in the City.  The City's 2000 census data showed that 11.7% of the City's population was African-American, whereas data from October 2004 showed that 61% and 62% of those on waiting lists for public housing and Section 8 assistance, respectively, were African-American.  Further, the City's 2000 report to HUD showed that 52% of minority-headed renter households were in the bottom bracket for household adjusted median family income, compared to 32% of all renter households.

(c) <u>The City's aggressive Housing Code enforcement practices increased costs for property owners that rent to low-income tenants.</u>  Appellants produced at least six affidavits describing the toll that the City's aggressive Housing Code enforcement took on their rental business.  They reported a substantial increase in costs, resulting in evictions for tenants and "forced sales" of their properties in some cases.  These allegations are corroborated by an internal memorandum from the City's fire marshal in 1995, comparing the Housing Code and the HQS and concluding that the Housing Code was more strict in regard to 82% of the examined categories.

(d) <u>The increased burden on rental-property owners from aggressive code enforcement resulted in less affordable housing in the City.</u>  Documents from the City and the Public Housing Authority acknowledged that any

decrease in federally assisted rental housing would reduce the amount of affordable housing in the City. Those predictions were supported by the City's Vacant Buildings Report, which showed that the number of vacant homes listed in the City rose from 367 to 1,466 between March 2003 and November 2007, which was a nearly 300% increase. Further, Appellants submitted affidavits from three tenants who alleged that they endured hardship when their homes were condemned for minimal or false Housing Code violations.

These premises, together, reasonably demonstrate that the City's aggressive enforcement of the Housing Code resulted in a disproportionate adverse effect on racial minorities, particularly African-Americans. Viewed in the light most favorable to Appellants, the evidence shows that the City's Housing Code enforcement temporarily, if not permanently, burdened Appellants' rental businesses, which indirectly burdened their tenants. Given the existing shortage of affordable housing in the City, it is reasonable to infer that the overall amount of affordable housing decreased as a result. And taking into account the demographic evidence in the record, it is reasonable to infer racial minorities, particularly African-Americans, were disproportionately affected by these events. See 215 Alliance v. Cuomo, 61 F. Supp. 2d 879, 889 (D. Minn. 1999) ("[M]inority, elderly, and disabled tenants face significant hurdles in locating housing above and beyond the mere shortage of low-income housing. . . . Any policy which results in the displacement of low-income tenants will disproportionately affect these particular low-income citizens whose housing options are especially constrained."). Though there is not a single document that connects the dots of Appellants' disparate impact claim, it is enough that each analytic step is reasonable and supported by evidence.

We note that a common method of showing a disproportionate adverse effect is to compare levels of dependence on affordable housing. Where a plaintiff demonstrates that a protected group depends on low-income housing to a greater extent than the non-protected population, other courts have found it reasonable to infer that the protected group will experience a disproportionate adverse effect from a

policy or decision that reduces low-income housing. See, e.g., Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575–76 (2d. Cir. 2003) (plaintiffs can establish disparate impact by showing statistics that (1) *x%* of all of a protected class in an area depend on a type of housing affected by the challenged policy or practice, (2) *y%* of all of the non-protected population depends on that type of housing, and, crucially, (3) *x* is significantly greater than *y*); Huntington Branch, 844 F.2d at 938 (disparate impact was established by evidence showing the number of African-American families that need subsidized housing, currently occupied subsidized rental projects, hold Section 8 certificates, and are on the waiting list for such certificates is disproportionate to the percentage of African-American families in the general population); Smith v. Town of Clarkton, N.C., 682 F.2d 1055, 1065 (4th Cir. 1982) ("The undisputed statistical picture leaves no doubt that the black population of Bladen County was adversely affected by the termination of the housing project, as it is that population most in need of new construction to replace substandard housing, and it is the one with the highest percentage of presumptively eligible applicants."); Owens v. Charleston Hous. Auth., 336 F. Supp. 2d 934, 943 (E.D. Mo. 2004), aff'd in part, Charleston Hous. Auth. v. U.S. Dep't of Agric., 419 F.3d 729 (8th Cir. 2005) (inferring a disparate impact based on evidence "that African-Americans represent a disproportionate number of low-income residents in need of low-income housing"); cf. Artisan/Am. Corp. v. City of Alvin, Tex., 588 F.3d 291, 298–99 (5th Cir. 2009) (plaintiff's claim failed due to absence of the types of evidence typically used to show a disparate impact: a waiting list for affordable housing, a demonstrated shortage of affordable housing, or identifiable tenants affected by the challenged action).

Relying on Reinhart v. Lincoln County, 482 F.3d 1225, 1230 (10th Cir. 2007), the City argues that Appellants must do more than show that the Housing Code increases the cost of low-income housing and that African-Americans tend to have lower incomes. The City's argument is misplaced, because Appellants have shown more in this case. Viewed most favorably to Appellants, the evidence demonstrates that there is a shortage of affordable housing and that the City's aggressive code

enforcement exacerbated that shortage.  See United States v. City of Black Jack, Mo., 508 F.2d 1179, 1186 (8th Cir. 1974) (FHA disparate impact claim supported in part by the fact that forty percent of African-American residents were living in substandard or overcrowded units).[4]  To the extent the City argues that a FHA violation cannot arise from a statistical link between income and race, we disagree.  "While [the City] ultimately may not be held liable under the [FHA] for economic discrimination, the existence of a significant statistical disparity, even one resulting from economic inequality, is sufficient to create a *prima facie* case and shift the burden to come forward with a legitimate business justification for the challenged practice."  Williams v. The 5300 Columbia Pike Corp., 891 F. Supp. 1169, 1180 n.23 (E.D. Va. 1995); see also Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1288 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978) (exclusion of low-cost housing units from defendant village had a discriminatory effect because "a greater number of black people than white people in the Chicago metropolitan area satisfy the income requirements for federally subsidized housing"); Black Jack, 508 F.2d at 1186 (reversing dismissal of plaintiff's FHA challenge to an exclusionary zoning ordinance, holding that disparate impact was established in part because a larger proportion of African-American than white households have low incomes); Bronson v. Crestwood Lake Section 1 Holding Corp., 724 F. Supp. 148, 154–55 (S.D.N.Y. 1989) (defendant apartment complex violated the FHA by refusing to consider prospective tenants based on their income levels).

---

[4]Of course, merely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim.  Plaintiffs must also show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population.  See Quad Enters. Co., LLC v. Town of Southold, No. 09-2963-cv, 2010 WL 807946, at *2 (2d Cir. Mar. 10, 2010) ("Simply proffering evidence that there is a shortage of handicapped-accessible housing in the Town of Southold compared to its handicapped population does not show that the neutral policy at issue is the cause.").

The district court concluded that Appellants must show (1) the different costs of rent for African-Americans under the City's Housing Code and the federal HQS and (2) the percentages of African-Americans and non-African-Americans who could not afford rent because the City enforced the Housing Code instead of the HQS. We agree that such a before-and-after cost-of-rent comparison is one way to show that African-Americans experience a disproportionate adverse effect. However, it is not the *only* way.[5] Appellants are not required provide a particular statistical comparison. See Teamsters, 431 U.S. at 340 (statistics to prove discrimination "come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances."). We conclude that Appellants offered enough evidence to withstand summary judgment on their prima facie case, thereby shifting the burden to the City to show a legitimate, non-discriminatory objective.

Turning to the second step of our analysis, Appellants concede that enforcement of the Housing Code has a manifest relationship to legitimate, non-discriminatory objectives. Specifically, the City has shown that enforcement of the Housing Code promotes the objectives of providing minimum property maintenance standards, keeping the City clean and housing habitable, and making the City's neighborhoods safe and livable. As such, the burden falls back on Appellants to "offer a viable alternative that satisfies the [City's] legitimate policy objectives while reducing the . . . discriminatory impact" of the City's code enforcement practices. Darst-Webbe, 417 F.3d at 906 (emphasis removed).

---

[5]In support of the district court's standard, Appellees cite Andrews v. City of New York, No. CV-01-7333, 2004 U.S. Dist. LEXIS 30290 (E.D.N.Y.) and Brown v. Omaha Housing Authority., No. 8:05CV423, 2007 WL 2123750 (D. Neb. July 20, 2007). Neither of those cases, however, specifies what method of proof is required for a disparate impact claim. At most, Andrews and Brown support the conclusion that statistics are useful to demonstrate a disparate impact. See also Tsombanidis, 352 F.3d at 575–76 (statistical evidence is "normally used in cases involving fair housing disparate impact claims").

The district court held in the alternative that Appellants' disparate impact claim fails as a matter of law under the third step of the burden-shifting analysis. On appeal, Appellants identify as a viable alternative the City's former program for Housing Code enforcement called "Problem Properties 2000" ("PP2000").[6] A "Progress Report" prepared by City employees in charge of PP2000 lists the goals and tactics of PP2000: identification of properties with a history of unresolved or repeat Housing Code violations, meeting with the owners individually, encouraging the owners to take a more business-like approach to managing their properties, keeping closer tabs on changes of ownership, and using consistent inspectors at each property. Appellants contend that PP2000 embodied a flexible and cooperative approach to code enforcement, which achieved the goals of code enforcement while maintaining a consistent supply of affordable housing. In support, they point to the Progress Report, which describes meetings with property owners as "very productive in gaining the cooperation of owners to step up their efforts towards improving their properties and the neighborhoods they are in." The report described a "good working relationships and lines of communication with these owners," which resulted in "owners working hard to be pro active in maintaining their properties." The report concluded, "[T]he program has been effective in eliminating complaints against the participating owners." These conclusions are corroborated by statements from a member of the PP2000 inspector group (Jeff Hawkins); a code enforcement officer (Appellee Dick Lippert); and Appellant Frank Steinhauser.

Thus far, the City has not argued that PP2000 would be more costly or would fail to accomplish the objectives of Housing Code enforcement. Rather, the City

_____

[6]The district court stated that Appellants abandoned PP2000 as a proposed alternative. However, Appellants argued for four pages in their joint brief in opposition to summary judgment that PP2000 was an alternative to the City's "heavy code enforcement." Appellants did not expressly abandon PP2000 as an alternative during the summary judgment hearing, and therefore we will consider it in this appeal.

asserts that PP2000 would not reduce the alleged impact on protected class tenants. The district court agreed with the City, explaining, "Because participating landlords were not excused from compliance with the Housing Code, they would still incur the same costs of compliance with the housing code, leaving any alleged discriminatory effect on African-Americans unchanged." Steinhauser, 595 F. Supp. 2d at 999 n.9. This reasoning, however, fails to appreciate that Appellants complain about *how* the City enforced the Housing Code—not just the code's standards and requirements. Appellants offer evidence that the challenged enforcement practices burdened rental-property owners and thereby reduced affordable housing options. There is also evidence that PP2000 generated a cooperative relationship with property owners, achieved greater code compliance, and resulted in less financial burdens on rental property owners. It is reasonable to infer from these facts, viewed most favorably to Appellants, that PP2000 would significantly reduce the impact on protected class members. Thus, there is a genuine dispute of fact regarding whether PP2000 was a viable alternative to the City's aggressive Housing Code enforcement practices.

Appellees do not advance any other basis for dismissing the FHA disparate impact claim. Accordingly, summary judgment was improper as to Appellants' disparate impact claim.

### (3) Other FHA Claims

The FHA also prohibits retaliation against any person on account of his having exercised or enjoyed a right granted or protected by the FHA. 42 U.S.C. § 3617; see generally Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002) (elements of FHA retaliation claim). Appellants vaguely assert that the City's code enforcement actions were retaliatory, but they have not identified how they exercised or encouraged others to exercise rights under the FHA or how the City retaliated. Appellants' unsupported and conclusory allegations cannot defeat summary judgment. Fed. R. Civ. P. 56(e)(2) (nonmoving party may not "rely merely

on allegations or denials in its own pleading; rather its response must . . . *set out specific facts* showing a genuine issue for trial") (emphasis added); <u>Weger v. City of Ladue</u>, 500 F.3d 710, 728 (8th Cir. 2007) (same). Further, to the extent that Appellants allege that the City retaliated against them for leasing to tenants in protected classes, their claim fails as a matter of law. Appellants were not exercising a right under the FHA by leasing to racial minorities. Were we to adopt Appellants' expansive view of § 3617, every disparate treatment claim would automatically become a retaliation claim.

Appellants also contend that the City failed to "affirmatively further fair housing," contrary to its certifications to HUD.[7] Included in this duty, according to Appellants, was an obligation to analyze impediments to fair housing. This claim is not properly before the Court because Appellants failed to pursue it as anything more than background information before the district court. <u>See</u> <u>Universal Title</u>, 942 F.2d at 1314. Were we to consider this claim, we would nonetheless conclude that the City's duty to "affirmatively further fair housing" has no independent significance. <u>See</u> <u>Langlois v. Abington Hous. Auth.</u>, 234 F. Supp. 2d 33, 72–73 (D. Mass. 2002) (duty to affirmatively further fair housing mirrors the obligations imposed by the FHA); <u>see also</u> <u>Charleston Hous. Auth.</u>, 419 F.3d at 740 (assuming that the "affirmatively further fair housing" claim is subsumed by the FHA claim).

Accordingly, the district court properly granted summary judgment on Appellants' claims that the City unlawfully retaliated against them, failed to affirmatively further fair housing, and failed to analyze impediments to fair housing.

---

[7]The duty to affirmatively further fair housing is actually rooted in the Quality Housing and Work Responsibility Act, 42 U.S.C. § 1437c-1(d)(16).

### B. Claims Pursuant to 42 U.S.C. §§ 1981, 1982, and 1985

Appellants' claims pursuant to 42 U.S.C. §§ 1981, 1982, and 1985 are duplicative with their FHA disparate treatment claim, as the underlying constitutional violations for these claims require a showing of discriminatory intent. See Dirden v. Dep't of Hous. & Urban Dev., 86 F.3d 112, 114 (8th Cir. 1996) (per curiam) (sections 1981 and 1982); Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996) (section 1985). Appellants acknowledge this overlap and argue that the district court did not consider "the evidence from the FHA analysis" when it evaluated their constitutional claims. However, the "evidence from the FHA analysis" is insufficient to establish discriminatory intent, and therefore it is irrelevant that the district court did not repeat its analysis. Because there is insufficient evidence to show a discriminatory intent, see supra Sec. II-A-(1), summary judgment was proper as to Appellants' claims under §§ 1981, 1982, and 1985.

### C. Equal Protection

Appellants contend that the district court improperly dismissed their equal-protection claim under 42 U.S.C. § 1983. Appellants do not argue that they are members of a suspect class or that their claims involve a fundamental right. Instead, they assert a "class of one" claim based on the City's preferential treatment of the Public Housing Authority ("PHA"), a distinct government entity funded by HUD that provided 4,300 units of public housing in St. Paul. To prevail on this claim, Appellants must prove that the City "intentionally treated [them] differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).

Even assuming *arguendo* that the City intentionally treated PHA differently than private property owners, summary judgment was warranted because Appellants have not refuted the rational basis for treating PHA differently from private rental

properties. As the district court explained, "PHA is an organization with a comprehensive inspection schedule, staff dedicated to maintenance, and a demonstrated record for maintaining its properties." Steinhauser, 595 F. Supp. 2d at 1008. The evidence presented by Appellees shows that PHA responds quickly and appropriately to DNHPI correction orders. The district court concluded, "Given the City's limited resources and PHA's record of maintaining its properties, Defendants have a rational basis for permitting PHA to manage its own repairs." Id. at 1009. Appellants fail to explain why this justification was inadequate. We conclude, therefore, that summary judgment was appropriate on their equal-protection claim.

### D. Substantive Due Process

Appellants in Case No. 09-1209 ("the Gallagher Appellants") appeal the dismissal of their substantive due process claim pursuant to 42 U.S.C. § 1983. We interpret their claim as challenging the City's Housing Code enforcement as applied to them, not as a facial challenge to any policy or practice. "[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases." Myers v. Scott County, 868 F.2d 1017, 1018 (8th Cir. 1989). To prevail on this claim, the Gallagher Appellants must show "a constitutionally protected property interest and that [City] officials used their power in such an arbitrary and oppressive way that it 'shocks the conscience.'" Entergy, Ark., Inc. v. Nebraska, 241 F.3d 979, 991 (8th Cir. 2001) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845–46 (1998)). In light of the uncontested legitimate goals of enforcing the Housing Code, there is insufficient evidence to reasonably conclude that this is a "truly egregious and extraordinary" example of government regulation.

In addition, the Gallagher Appellants contend that Code Compliance Certification violated their substantive due process rights because that procedure conflicts with the Minnesota State Building Code. The supposed conflict with

Minnesota state law is not actionable under § 1983, <u>Myers</u>, 868 F.3d at 1018, and will be discussed further in Section II-G.

For these reasons, summary judgment was proper on the <u>Gallagher</u> Appellants' substantive due process claim.

### E.    Void for Vagueness

The <u>Gallagher</u> Appellants allege that the St. Paul Legislative Code is void for vagueness in violation of the due process clauses of the Fifth and Fourteenth Amendments.  They appear to assert both an "as applied" challenge and a facial challenge.

First, the <u>Gallagher</u> Appellants challenge the term "vacant building" in § 43.02(7)(e) as applied to the property at 1522/1524 Carroll Ave.  The Carroll Ave. property was allegedly declared vacant twenty-three days after the property was sold to Appellant Troy Allison.  The <u>Gallagher</u> Appellants complain that the DNHPI inspector ignored the "obvious occupancy" of the home and based his vacancy determination merely on an observation that the second-story window lacked any blinds or window coverings.  However, as the district court noted, Allison admitted in his deposition testimony that the downstairs unit at the Carroll Ave. property was unoccupied and had multiple Housing Code violations when the City declared it a vacant building.  The <u>Gallagher</u> Appellants do not challenge that finding on appeal.  As such, the Carroll Ave. property was clearly within the definition of a vacant building.  <u>See</u> St. Paul, Minn. Code § 43.02(7)(e) (defining a "vacant building" as "[a] building or portion of a building which is . . . unoccupied and has multiple housing or building code violations").  Therefore, Allison cannot complain of the vagueness of § 43.02(7)(e).  <u>See</u> <u>Parker v. Levy</u>, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

The Gallagher Appellants also assert a facial challenge to several chapters of the St. Paul Code under the void-for-vagueness doctrine. Facial challenges to legislative enactments are, to say the least, discouraged. See United States v. Stephens, 594 F.3d 1033, 1037 (8th Cir. 2010). Appellants' basic complaint is that the St. Paul Code does not provide sufficient notice of rental property owners' obligations under the law, placing unwarranted discretion in the hands of DNHPI. The Gallagher Appellants point to several City employees' inability to explain the categorization of vacant buildings and the meaning of the terms "problem property" and "Code Compliance Certification." However, the Gallagher Appellants must do more than allege general confusion regarding a legislative enactment. To start with, they must identify a particular section of the St. Paul Code that is impermissibly vague, as we will not declare entire chapters of the St. Paul Code facially unconstitutional. Appellants fail to reference a particular section of the St. Paul Code, let alone analyze why that section is vague. Without more, the Gallagher Appellants' facial void-for-vagueness claim fails as a matter of law.

**F.     RICO[8]**

Appellants allege causes of action under 18 U.S.C. §§ 1962(c) and (d). "A plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Handeen v. Lemaire, 112 F.3d 1339, 1347 (8th Cir. 1997). Under § 1962(d), conspiracy to violate § 1962(c) is also prohibited. "Racketeering activity" is defined in 18 U.S.C. § 1961(1) as a list of predicate acts, including certain state law crimes, conduct that is indictable under various federal provisions, and numerous other offenses. On appeal, Appellants have narrowed the alleged RICO predicate acts to several patterns of conduct, which we address in turn.

---

[8]Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

Appellants allege that Magner, a DNHPI supervisor, engaged in a scheme of extortion and attempted extortion. Specifically, they allege that Magner approached property owners after he wrote up Housing Code violations and offered to arrange a sale of their property for a price well-below market value. It is undisputed that none of those property owners actually accepted Magner's offer. Appellants assert that Magner transferred "inside knowledge" to a "close friend," Wally Nelson, who subsequently purchased "many distressed single family and duplex homes under Magner's control." They further allege that Nelson, in return, has provided construction services to Magner's father at a discounted rate.

Even if we assume there is sufficient evidence of a RICO predicate act, Appellants lack standing to challenge Magner's conduct. Importantly, the only evidence offered to support Appellants' allegations are three affidavits from rental-property owners who are not plaintiffs in these consolidated lawsuits. Appellants have not shown that they themselves suffered any injury from the alleged extortion scheme, and therefore their RICO-based extortion claims fail for lack of standing. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) ("[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."); Bowman v. W. Auto Supply Co., 985 F.2d 383, 384 (8th Cir. 1993) (Section 1964(c) "confers standing on any individual who has experienced injury to his or her business or property that occurred 'by reason of' a RICO violation"); see also Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1347 (2d Cir. 1994).

Next, the Appellants in Cases No. 09-1528 and 09-1579 argue on appeal that the City went so far as to 'fix' the State District Court in their favor." Collectively, the allegations amount to a pattern of cooperation between Dawkins, the city attorney, the mayor, a housing referee, and a Minnesota state judge, resulting in a "crackdown" on landlords in the City. Though these are serious allegations, summary judgment was nonetheless appropriate. The sole evidentiary basis for this claim is Appellant

Meysembourg's affidavit, which essentially mirrors the argument in Appellants' brief. Notably, Meysembourg's affidavit merely states that he "learned" this troublesome story without any explanation of how he learned it. Appellants "may not rest on mere allegations," but instead must "set forth specific facts showing that there is a genuine issue for trial." Postscript Enters. v. City of Bridgeton, 905 F.2d 223, 226 (8th Cir. 1990) (quotation omitted). Affidavits are one way to set forth such facts, but "the affidavits must be made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated." Id. Under these standards, Appellants' proffered evidence is insufficient. Alternatively, Appellants' claim fails because they have not explained what predicate act they are alleging. General allegations of inter-governmental cooperation and use of phrases like "buy in" are not enough to formulate a RICO claim.

Appellants allege other predicate acts, including falsification of Housing Code violations, intentional delay and misdirection of notices, concealment of the strict nature of the Housing Code, condemnation of properties without justification, and violation of the state building code. These claims, however, lack adequate evidentiary support for a RICO claim. Accordingly, summary judgment was appropriate on all of Appellants' RICO claims.

### G. State Law Claims – Abuse of Process, Tortious Interference with Contract, Tortious Interference with Business Expectancy

Appellants seemingly appeal the district court's dismissal of their state law claims, but they fail to offer any evidence in support of these claims or explain why the district court's analysis was wrong. Instead, they merely reiterate the theme of their case—the "discriminatory environment and attitude in housing code enforcement." These conclusory allegations are insufficient to defeat summary judgment. Rodgers v. City of Des Moines, 435 F.3d 904, 907–08 (8th Cir. 2006)

("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

### H. Conflict with the Minnesota State Building Code

Appellants argue that the City's use of Code Compliance Certification violated the Minnesota State Building Code by requiring properties to satisfy current building code standards, thereby removing "grandfathered" protections under state law. Appellants have articulated this claim under the doctrine of preemption. See generally City of Morris v. SAX Invs., Inc., 749 N.W.2d 1 (Minn. 2008) (holding that the Minnesota State Building Code expressly preempts a city's licensing ordinances for rental properties). We do not reach Appellants' preemption arguments because they are not before the Court. We have reviewed the latest amended complaints in these actions, which total 228 pages, and even the most liberal construction of the complaints does not indicate a preemption claim. Indeed, the amended complaints do not even allege that the City has violated state law, let alone state "a short and plain statement of the claim showing that [Appellants are] entitled to relief." Fed. R. Civ. P. 8(a)(2). As such, Appellants' preemption arguments are inapposite to the causes of action before the Court. We note that Appellants may amend their complaint on remand, see City of Columbia, Mo. v. Paul N. Howard Co., 707 F.2d 338, 341 (8th Cir. 1983) ("An amendment can be proper after remand to the district court even if the claim was presented for the first time on appeal or had not been presented to the district court in a timely fashion."), and also that our partial affirmance of summary judgment in this case is without prejudice to any preemption claim that may be available in state court.

## III.  Spoliation-of-Evidence Sanctions

A brief history of the discovery disputes in this case is appropriate.  Appellants filed their complaints in these actions in May 2004, March 2005, and July 2005.  Initial discovery requests were served as early as November 2004.   In 2007, Appellants learned that, pursuant to routine document-retention policies, the City destroyed emails sent or received prior to December 2005 and Truth-in-Sale-of-Housing ("TISH") reports from 2001 to 2003.[9]  Appellants moved for sanctions against the City based on the City's failure to produce several documents not relevant to this appeal and failure to place a litigation hold on destruction of TISH reports and emails/e-data.  The magistrate judge denied the motion for sanctions, explaining that Appellants failed to demonstrate prejudice, i.e., that the material would have contained pertinent evidence.  The magistrate judge noted that Appellants could renew their motion for sanctions if and when they could demonstrate prejudice.  The district court affirmed the magistrate judge's denial of sanctions.

In February 2008, Appellants renewed their motion for sanctions.   The magistrate judge noted the "extensive discovery" that had occurred since the court's

---

[9]The City's Truth-in-Sale-of-Housing ordinance is a consumer protection measure that requires any person who sells a dwelling in the City to have an evaluation completed by a TISH evaluator licensed by the TISH examining board.  St. Paul, Minn. Legis. Code § 189.03.  The TISH evaluator, who is not a city employee, then produces a TISH disclosure report. The owner must (a) make available the TISH report to all potential buyers and (b) file the TISH report with the examining board before the sale of the dwelling.  Id.  As the district court recognized, the 2001-2003 TISH reports may have contained pertinent evidence in this case because TISH evaluators are required to note deviations from TISH guidelines, major structural defects, and immediate hazards to health and safety.  Id. § 189.05.  However, the probative value is likely weak, as the St. Paul Code also states, "Nothing in the disclosure report shall indicate, or shall be deemed to indicate, that such dwellings meet all minimum housing and building standards."  Id.

first order. She then denied the renewed motion for sanctions because Appellants still failed to demonstrate prejudice. The magistrate also concluded that Appellants did not demonstrate that the City intentionally destroyed or withheld evidence to suppress the truth. The district court affirmed.

Appellants challenge both denials of sanctions, arguing that the City abused the discovery process by failing to place a litigation hold on the destruction of emails and TISH reports. They request an inference that "the evidence destroyed was unfavorable" to the City. District courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991). We review an order denying discovery sanctions for an abuse of discretion. Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 745 (8th Cir. 2004). "We give substantial deference to the district court's determination as to whether sanctions are warranted because of its familiarity with the case and counsel involved." Willhite v. Collins, 459 F.3d 866, 869 (8th Cir. 2006); accord Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007).

It appears that, with the assistance of a data-recovery firm, the City provided Appellants over one million email files following the magistrate judge's first order. With regard to the email files produced, the district court acted within its discretion by refusing sanctions. See Greyhound Lines, 485 F.3d at 1035 ("Because Archway received responsive answers months before trial, the district court properly refused discovery sanctions."). To the extent Appellants complain about the delay in production of those email files, such prejudice was remedied at the district-court level by the postponement of the summary judgment hearing and the extension of pretrial deadlines. Indeed, Appellants had access to the email files three months before they filed their brief opposing the City's motion for summary judgment.

Appellants contend that the City has not produced all email files from before December 2005, although the record on this point is not very clear. Giving Appellants

the benefit of the doubt, we assume the City has not produced some of the requested email files from City employee accounts. Appellants argue that the destroyed email files would have supported their claim of intentional discrimination. However, Appellants offer no support for such speculation; there is no basis for inferring that the missing emails would be of a different character than the emails already recovered and produced. Therefore, we agree that Appellants have not demonstrated the requisite prejudice. See Stevenson, 354 F.3d at 748 (prejudice required before sanctions are appropriate); see also Koons v. Aventis Pharm., Inc., 367 F.3d 768, 780 (8th Cir. 2004) (no prejudice where there is no evidence that the lost document contained anything that would have affected the course of litigation).

With regard to the TISH reports, the City provided Appellants with a list of forty-five TISH evaluators who prepared disclosure reports on properties in the City from 2001 to 2003. From that information, Appellants could subpoena the TISH reports (at the City's expense). Appellants chose not to subpoena the TISH evaluators for their records. The magistrate judge concluded, "Such a failure to pursue discovery is incongruent with Plaintiff's claim of prejudice." We agree. In evaluating prejudice, we have looked to whether an allegedly harmed party took other available means to obtain the requested information. See Sentis Group, Inc. v. Shell Oil Co., 559 F.3d 888, 903 (8th Cir. 2009). Under these circumstances, the district court did not abuse its discretion by finding that prejudice was lacking.

Also critical to our decision is the magistrate judge's conclusion that the City did not intentionally destroy or withhold evidence in an attempt to suppress the truth. See Greyhound Lines, 485 F.3d at 1035 ("The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth[.]"). To be sure, a district court does not abuse its discretion by imposing sanctions, even absent an explicit bad faith finding, where a party destroys specifically requested evidence after litigation has commenced. Stevenson, 354 F.3d at 749–50. However, where a court expressly finds, as here, that there is no evidence

-32-

of intentional destruction of evidence to suppress the truth, then the district court also acts within its discretionary limits by denying sanctions for spoliation of evidence. See Morris v. Union Pac. R.R., 373 F.3d 896, 901 (8th Cir. 2004) ("The most important consideration in our analysis is the district court's own finding regarding Union Pacific's intent.").[10]

The district court did not abuse its discretion by denying Appellants' motion for sanctions and renewed motion for sanctions.

## IV. Discovery of Magner's Personal Records

The Gallagher Appellants also appeal the district court's denial of their motion to compel the production of Magner's tax, banking, and cell phone records. They contend that these records would lead to discoverable evidence to prove extortion for their RICO claim. This issue does not warrant further discussion, as we agree with the magistrate judge's sound reasoning and conclude that the district court did not abuse its discretion. See Stuart v. Gen. Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000) (standard of review for denial of motion to compel).

## V. Conclusion

For the foregoing reasons, the district court's order granting summary judgment is reversed with regard to Appellants' disparate impact claim and affirmed as to the remaining claims. We affirm the district court's denial of Appellants motions for

---

[10]Appellants argue in their reply briefs that the magistrate judge improperly required them to demonstrate bad faith as a precondition for spoliation-of-evidence sanctions. However, Appellants failed to assert their legal argument in their opening briefs, thereby depriving the Court of full briefing on this issue. As such, we deem Appellants' argument waived. See Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008).

sanctions, renewed motion for sanction, and motion to compel.  We remand these consolidated cases for further proceedings consistent with this opinion.[11]

_____

_____

[11]We reject Appellants' request that we assign the case on remand to a district judge from outside the District of Minnesota.