Justice THOMAS, dissenting.
I join Justice ALITO's dissent in full. I write separately to point out that the foundation on which the Court builds its latest disparate-impact regime-Griggs v. Duke Power Co.,401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)-is made of sand. That decision, which concluded that Title VII of the Civil Rights Act of 1964 authorizes plaintiffs to bring disparate-impact claims, id.,at 429-431, 91 S.Ct. 849represents the triumph of an agency's preferences over Congress' enactment and of assumption over fact. Whatever respect Griggsmerits as a matter of stare decisis,I would not amplify its error by importing its disparate-impact scheme into yet another statute.
I
A
We should drop the pretense that Griggs' interpretation of Title VII was legitimate. "The Civil Rights Act of 1964 did not include an express prohibition on policies or practices that produce a disparate impact." Ricci v. DeStefano,557 U.S. 557, 577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). It did not include an implicit one either. Instead, Title VII's operative provision, 42 U.S.C. § 2000e-2(a) (1964 ed.), addressed only employer decisions motivated by a protected characteristic. That provision made it "an unlawful employment practice for an employer-
"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because ofsuch individual's race, color, religion, sex, or national origin; or
"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." § 703, 78 Stat. 255 (emphasis added).[1]
Each paragraph in § 2000e-2(a)is limited to actions taken "because of" a protected trait, and "the ordinary meaning of 'because of' is 'by reason of' or 'on account of,' " University of Tex. Southwestern Medical Center v. Nassar,570 U.S. ----, ----, 133 S.Ct. 2517, 2527, 186 L.Ed.2d 503 (2013)(some internal quotation marks omitted). Section 2000e-2(a)thus applies only when a protected characteristic "was the 'reason' that the employer decided to act." Id.,at ----, 133 S.Ct., at 2527(some internal quotation marks omitted).[2]In *2527 other words, "to take action against an individual because of" a protected trait "plainly requires discriminatory intent." See Smith v. City of Jackson,544 U.S. 228, 249, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005)(O'Connor, J., joined by KENNEDY and THOMAS, JJ., concurring in judgment) (internal quotation marks omitted); accord, e.g., Gross v. FBL Financial Services, Inc.,557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).
No one disputes that understanding of § 2000e-2(a)(1). We have repeatedly explained that a plaintiff bringing an action under this provision "must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." Ricci, supra,at 577, 129 S.Ct. 2658(quoting Watson v. Fort Worth Bank & Trust,487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). The only dispute is whether the same language-"because of"-means something different in § 2000e-2(a)(2)than it does in § 2000e-2(a)(1).
The answer to that question should be obvious. We ordinarily presume that "identical words used in different parts of the same act are intended to have the same meaning," Desert Palace, Inc. v. Costa,539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)(internal quotation marks omitted), and § 2000e-2(a)(2)contains nothing to warrant a departure from that presumption. That paragraph "uses the phrase 'because of ... [a protected characteristic]' in precisely the same manner as does the preceding paragraph-to make plain that an employer is liable only if its adverse action against an individual is motivated by the individual's [protected characteristic]." Smith, supra,at 249, 125 S.Ct. 1536(opinion of O'Connor, J.) (interpreting nearly identical provision of the Age Discrimination in Employment Act of 1967 (ADEA)).
The only difference between § 2000e-2(a)(1)and § 2000e-2(a)(2)is the type of employment decisions they address. See Smith, supra,at 249, 125 S.Ct. 1536(opinion of O'Connor, J.).Section 2000e-2(a)(1)addresses hiring, firing, and setting the terms of employment, whereas § 2000e-2(a)(2)generally addresses limiting, segregating, or classifying employees. But no decision is an unlawful employment practice under these paragraphs unless it occurs "because ofsuch individual's race, color, religion, sex, or national origin." §§ 2000e-2(a)(1), (2)(emphasis added).
Contrary to the majority's assumption, see ante,at 2517 - 2520, the fact that § 2000e-2(a)(2)uses the phrase "otherwise adversely affect" in defining the employment decisions targeted by that paragraph does not eliminate its mandate that the prohibited decision be made "because of" a protected characteristic. Section 2000e-2(a)(2)does not make unlawful all employment decisions that "limit, segregate, or classify ... employees ... in any way which would ... otherwise adversely affect [an individual's] status as an employee," but those that "otherwise adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin." (Emphasis added); accord, 78 Stat. 255. Reading § 2000e-2(a)(2)to sanction employers solely on the basis of the effects of their decisions would delete an entire clause of this provision, a result we generally try to avoid. Under any fair reading of the text, there can be no doubt that the *2528 Title VII enacted by Congress did not permit disparate-impact claims.[3]
B
The author of disparate-impact liability under Title VII was not Congress, but the Equal Employment Opportunity Commission (EEOC). EEOC's "own official history of these early years records with unusual candor the commission's fundamental disagreement with its founding charter, especially Title VII's literal requirement that the discrimination be intentional." H. Graham, The Civil Rights Era: Origins and Development of National Policy 1960-1972, p. 248 (1990). The Commissioners and their legal staff thought that "discrimination" had become "less often an individual act of disparate treatment flowing from an evil state of mind" and "more institutionalized." Jackson, EEOC vs. Discrimination, Inc., 75 The Crisis 16 (1968). They consequently decided they should target employment practices "which prove to have a demonstrable racial effect without a clear and convincing business motive." Id.,at 16-17 (emphasis deleted). EEOC's "legal staff was aware from the beginning that a normal, traditional, and literal interpretation of Title VII could blunt their efforts" to penalize employers for practices that had a disparate impact, yet chose "to defy Title VII's restrictions and attempt to build a body of case law that would justify [their] focus on effects and [their] disregard of intent." Graham, supra,at 248, 250.
The lack of legal authority for their agenda apparently did not trouble them much. For example, Alfred Blumrosen, one of the principal creators of disparate-impact liability at EEOC, rejected what he described as a "defeatist view of Title VII" that saw the statute as a "compromise" with a limited scope. A. Blumrosen, Black Employment and the Law 57-58 (1971). Blumrosen "felt that most of the problems confronting the EEOC could be solved by creative interpretation of Title VII which would be upheld by the courts, partly out of deference to the administrators." Id.,at 59.
EEOC's guidelines from those years are a case study in Blumrosen's "creative interpretation." Although EEOC lacked substantive rulemaking authority, see Faragher v. Boca Raton,524 U.S. 775, 811, n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(THOMAS, J., dissenting), it repeatedly issued guidelines on the subject of disparate impact. In 1966, for example, EEOC issued guidelines suggesting that the use of employment tests in hiring decisions could violate Title VII based on disparate impact, notwithstanding the statute's express statement that "it shall not be an unlawful employment practice ... to give and to act upon the results of any professionally developed ability test provided that such test ... is not designed, intended, or usedto discriminate because of race, color, religion, sex, or national origin," § 2000e-2(h)(emphasis added). See EEOC, Guidelines on Employment Testing Procedures 2-4 (Aug. 24, 1966). EEOC followed this up with a 1970 guideline that was even more explicit, declaring that, unless certain criteria were met, "[t]he use of any test which adversely affects hiring, promotion, transfer or any other employment *2529 or membership opportunity of classes protected by title VII constitutes discrimination." 35 Fed.Reg. 12334 (1970).
EEOC was initially hesitant to take its approach to this Court, but the Griggsplaintiffs forced its hand. After they lost on their disparate-impact argument in the Court of Appeals, EEOC's deputy general counsel urged the plaintiffs not to seek review because he believed " 'that the record in the case present[ed] a most unappealing situation for finding tests unlawful,' " even though he found the lower court's adherence to an intent requirement to be " 'tragic.' " Graham, supra,at 385. The plaintiffs ignored his advice. Perhaps realizing that a ruling on its disparate-impact theory was inevitable, EEOC filed an amicusbrief in this Court seeking deference for its position.[4]
EEOC's strategy paid off. The Court embraced EEOC's theory of disparate impact, concluding that the agency's position was "entitled to great deference." See Griggs,401 U.S., at 433-434, 91 S.Ct. 849. With only a brief nod to the text of § 2000e-2(a)(2)in a footnote, id.,at 426, n. 1, 91 S.Ct. 849the Court tied this novel theory of discrimination to "the statute's perceived purpose" and EEOC's view of the best way of effectuating it, Smith,544 U.S., at 262, 125 S.Ct. 1536(opinion of O'Connor, J.); see id.,at 235, 125 S.Ct. 1536(plurality opinion). But statutory provisions-not purposes-go through the process of bicameralism and presentment mandated by our Constitution. We should not replace the former with the latter, see Wyeth v. Levine,555 U.S. 555, 586, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)(THOMAS, J., concurring in judgment), nor should we transfer our responsibility for interpreting those provisions to administrative agencies, let alone ones lacking substantive rulemaking authority, see Perez v. Mortgage Bankers Assn.,575 U.S. ----, ---- - ----, 135 S.Ct. 1199, 1216-1220, 191 L.Ed.2d 186 (2015)(THOMAS, J., concurring in judgment).
II
Griggs' disparate-impact doctrine defies not only the statutory text, but reality itself. In their quest to eradicate what they view as institutionalized discrimination, disparate-impact proponents doggedly assume that a given racial disparity at an institution is a product of that institution rather than a reflection of disparities that exist outside of it. See T. Sowell, Intellectuals and Race 132 (2013) (Sowell). That might be true, or it might not. Standing alone, the fact that a practice has a disparate impact is not conclusive evidence, as the GriggsCourt appeared to *2530 believe, that a practice is "discriminatory," 401 U.S., at 431, 91 S.Ct. 849. "Although presently observed racial imbalance mightresult from past [discrimination], racial imbalance can also result from any number of innocent private decisions." Parents Involved in Community Schools v. Seattle School Dist. No. 1,551 U.S. 701, 750, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007)(THOMAS, J., concurring) (emphasis added).[5]We should not automatically presume that any institution with a neutral practice that happens to produce a racial disparity is guilty of discrimination until proved innocent.
As best I can tell, the reason for this wholesale inversion of our law's usual approach is the unstated-and unsubstantiated-assumption that, in the absence of discrimination, an institution's racial makeup would mirror that of society. But the absence of racial disparities in multi-ethnic societies has been the exception, not the rule. When it comes to "proportiona[l] represent [ation]" of ethnic groups, "few, if any, societies have ever approximated this description." D. Horowitz, Ethnic Groups in Conflict 677 (1985). "All multi-ethnic societies exhibit a tendency for ethnic groups to engage in different occupations, have different levels (and, often, types) of education, receive different incomes, and occupy a different place in the social hierarchy." Weiner, The Pursuit of Ethnic Equality Through Preferential Policies: A Comparative Public Policy Perspective, in From Independence to Statehood 64 (R. Goldmann & A. Wilson eds. 1984).
Racial imbalances do not always disfavor minorities. At various times in history, "racial or ethnic minorities ... have owned or directed more than half of whole industries in particular nations." Sowell 8. These minorities "have included the Chinese in Malaysia, the Lebanese in West Africa, Greeks in the Ottoman Empire, Britons in Argentina, Belgians in Russia, Jews in Poland, and Spaniards in Chile-among many others." Ibid. (footnotes omitted). "In the seventeenth century Ottoman Empire," this phenomenon was seen in the palace itself, where the "medical staff consisted of 41 Jews and 21 Muslims." Ibid. And in our own country, for roughly a quarter-century now, over 70 percent of National Basketball Association players have been black. R. Lapchick, D. Donovan, E. Loomer, & L. Martinez, Institute for Diversity and Ethics in Sport, U. of Central Fla., The 2014 Racial and Gender Report Card: National Basketball Association 21 (June 24, 2014). To presume that these and all other measurable disparities are products of racial discrimination is to ignore the complexities of human existence.
Yet, if disparate-impact liability is not based on this assumption and is instead simply a way to correct for imbalances that do not result from any unlawful conduct, it is even less justifiable. This Court has repeatedly reaffirmed that " 'racial balancing' " by state actors is " 'patently unconstitutional,' " even when it supposedly springs from good intentions.
*2531 Fisher v. University of Tex. at Austin,570 U.S. ----, ----, 133 S.Ct. 2411, 2419, 186 L.Ed.2d 474 (2013). And if that "racial balancing" is achieved through disparate-impact claims limited to only some groups-if, for instance, white basketball players cannot bring disparate-impact suits-then we as a Court have constructed a scheme that parcels out legal privileges to individuals on the basis of skin color. A problem with doing so should be obvious: "Government action that classifies individuals on the basis of race is inherently suspect." Schuette v. BAMN,572 U.S. ----, ----, 134 S.Ct. 1623, 1634-1635, 188 L.Ed.2d 613 (2014)(plurality opinion); accord, id.,at ----, 134 S.Ct., at 1643-1644(SCALIA, J., concurring in judgment). That is no less true when judges are the ones doing the classifying. See id.,at ----, 134 S.Ct., at 1634-1635(plurality opinion); id.,at ----, 134 S.Ct., at 1643-1644(SCALIA, J., concurring in judgment). Disparate-impact liability is thus a rule without a reason, or at least without a legitimate one.
III
The decision in Griggswas bad enough, but this Court's subsequent decisions have allowed it to move to other areas of the law. In Smith,for example, a plurality of this Court relied on Griggsto include disparate-impact liability in the ADEA. See 544 U.S., at 236, 125 S.Ct. 1536. As both I and the author of today's majority opinion recognized at the time, that decision was as incorrect as it was regrettable. See id.,at 248-249, 125 S.Ct. 1536(O'Connor, J., joined by KENNEDY and THOMAS, JJ., concurring in judgment). Because we knew that Congress did not create disparate-impact liability under Title VII, we explained that "there [wa]s no reason to suppose that Congress in 1967"-four years before Griggs-"could have foreseen the interpretation of Title VII that was to come." Smith, supra,at 260, 125 S.Ct. 1536(opinion of O'Connor, J.). It made little sense to repeat Griggs' error in a new context.
My position remains the same. Whatever deference is due Griggsas a matter of stare decisis,we should at the very least confine it to Title VII. We should not incorporate it into statutes such as the Fair Housing Act and the ADEA, which were passed years before Congress had any reason to suppose that this Court would take the position it did in Griggs. See Smith, supra,at 260, 125 S.Ct. 1536(opinion of O'Connor, J.).And we should certainly not allow it to spread to statutes like the Fair Housing Act, whose operative text, unlike that of the ADEA's, does not even mirror Title VII's.
Today, however, the majority inexplicably declares that "the logic of Griggsand Smith" leads to the conclusion that "the FHA encompasses disparate-impact claims." Ante,at 2518. Justice ALITO ably dismantles this argument. Post, at 2543 - 2547 (dissenting opinion). But, even if the majority were correct, I would not join it in following that "logic" here. "[E]rroneous precedents need not be extended to their logical end, even when dealing with related provisions that normally would be interpreted in lockstep. Otherwise, stare decisis,designed to be a principle of stability and repose, would become a vehicle of change ... distorting the law." CBOCS West, Inc. v. Humphries,553 U.S. 442, 469-470, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008)(THOMAS, J., dissenting) (footnote omitted). Making the same mistake in different areas of the law furthers neither certainty nor judicial economy. It furthers error.
That error will take its toll. The recent experience of the Houston Housing Authority (HHA) illustrates some of the many costs of disparate-impact liability.
*2532 HHA, which provides affordable housing developments to low-income residents of Houston, has over 43,000 families on its waiting lists. The overwhelming majority of those families are black. Because Houston is a majority-minority city with minority concentrations in all but the more affluent areas, any HHA developments built outside of those areas will increase the concentration of racial minorities. Unsurprisingly, the threat of disparate-impact suits based on those concentrations has hindered HHA's efforts to provide affordable housing. State and federal housing agencies have refused to approve all but two of HHA's eight proposed development projects over the past two years out of fears of disparate-impact liability. Brief for Houston Housing Authority as Amicus Curiae8-12. That the majority believes that these are not " 'dire consequences,' " see ante,at 2525, is cold comfort for those who actually need a home.
* * *
I agree with the majority that Griggs"provide[s] essential background" in this case, ante,at 2517: It shows that our disparate-impact jurisprudence was erroneous from its inception. Divorced from text and reality, driven by an agency with its own policy preferences, Griggsbears little relationship to the statutory interpretation we should expect from a court of law. Today, the majority repeats that error.
I respectfully dissent.
Justice ALITO, with whom THE CHIEF JUSTICE, Justice SCALIA, and Justice THOMAS join, dissenting.
No one wants to live in a rat's nest. Yet in Gallagher v. Magner,619 F.3d 823 (2010), a case that we agreed to review several Terms ago, the Eighth Circuit held that the Fair Housing Act (or FHA), 42 U.S.C. § 3601 et seq.,could be used to attack St. Paul, Minnesota's efforts to combat "rodent infestation" and other violations of the city's housing code. 619 F.3d, at 830. The court agreed that there was no basis to "infer discriminatory intent" on the part of St. Paul. Id.,at 833. Even so, it concluded that the city's "aggressive enforcement of the Housing Code" was actionable because making landlords respond to "rodent infestation, missing dead-bolt locks, inadequate sanitation facilities, inadequate heat, inoperable smoke detectors, broken or missing doors," and the like increased the price of rent. Id.,at 830, 835. Since minorities were statistically more likely to fall into "the bottom bracket for household adjusted median family income," they were disproportionately affected by those rent increases, i.e.,there was a "disparate impact." Id.,at 834. The upshot was that even St. Paul's good-faith attempt to ensure minimally acceptable housing for its poorest residents could not ward off a disparate-impact lawsuit.
Today, the Court embraces the same theory that drove the decision in Magner.[1]This is a serious mistake. The Fair Housing Act does not create disparate-impact liability, nor do this Court's precedents. And today's decision will have unfortunate consequences for local government, private enterprise, and those living in poverty. Something has gone badly awry when a city can't even make slumlords kill rats without fear of a lawsuit. Because Congress did not authorize any of this, I respectfully dissent.
*2533 I
Everyone agrees that the FHA punishes intentional discrimination. Treating someone "less favorably than others because of a protected trait" is " 'the most easily understood type of discrimination.' " Ricci v. DeStefano,557 U.S. 557, 577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)(quoting Teamsters v. United States,431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); some internal quotation marks omitted). Indeed, this classic form of discrimination-called disparate treatment-is the only one prohibited by the Constitution itself. See, e.g., Arlington Heights v. Metropolitan Housing Development Corp.,429 U.S. 252, 264-265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). It is obvious that Congress intended the FHA to cover disparate treatment.
The question presented here, however, is whether the FHA also punishes "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." Ricci, supra,at 577, 129 S.Ct. 2658. The answer is equally clear. The FHA does not authorize disparate-impact claims. No such liability was created when the law was enacted in 1968. And nothing has happened since then to change the law's meaning.
A
I begin with the text. Section 804(a) of the FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because ofrace, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a)(emphasis added). Similarly, § 805(a) prohibits any party "whose business includes engaging in residential real estate-related transactions" from "discriminat[ing] against any person in making available such a transaction, or in the terms or conditions of such a transaction, because ofrace, color, religion, sex, handicap, familial status, or national origin." § 3605(a)(emphasis added).
In both sections, the key phrase is "because of." These provisions list covered actions ("refus[ing] to sell or rent ... a dwelling," "refus[ing] to negotiate for the sale or rental of ... a dwelling," "discriminat[ing]" in a residential real estate transaction, etc.) and protected characteristics ("race," "religion," etc.). The link between the actions and the protected characteristics is "because of."
What "because of" means is no mystery. Two Terms ago, we held that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' " University of Tex. Southwestern Medical Center v. Nassar,570 U.S. ----, ----, 133 S.Ct. 2517, 2527, 186 L.Ed.2d 503 (2013)(quoting Gross v. FBL Financial Services, Inc.,557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009); some internal quotation marks omitted). A person acts "because of" something else, we explained, if that something else " 'was the "reason" that the [person] decided to act.' " 570 U.S., at ----, 133 S.Ct., at 2527.
Indeed, just weeks ago, the Court made this same point in interpreting a provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m), that makes it unlawful for an employer to take a variety of adverse employment actions (such as failing or refusing to hire a job applicant or discharging an employee) "because of" religion. See EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. ----, ----, 135 S.Ct. 2028, 2032-2033, ---L.Ed.2d ---- (2015). The Court wrote: " 'Because of' in § 2000e-2(a)(1)links the forbidden consideration to each of the verbs preceding it." Ibid.
*2534 Nor is this understanding of "because of" an arcane feature of legal usage. When English speakers say that someone did something "because of" a factor, what they mean is that the factor was a reason for what was done. For example, on the day this case was argued, January 21, 2015, Westlaw and Lexis searches reveal that the phrase "because of" appeared in 14 Washington Post print articles. In every single one, the phrase linked an action and a reason for the action.[2]
Without torturing the English language, the meaning of these provisions of the FHA cannot be denied. They make it unlawful to engage in any of the covered actions "because of"-meaning "by reason of" or "on account of," Nassar, supra,at 2530, 133 S.Ct., at 2527-race, religion, etc. Put another way, "the terms [after] the 'because of' clauses in the FHA supply the prohibited motivations for the intentional acts ... that the Act makes unlawful." American Ins. Assn. v. Department of Housing and Urban Development,---F.Supp.3d ----, ---- n. 20, 2014 WL 5802283, at *8, n. 20 (D.D.C.2014). Congress accordingly outlawed the covered actions only when they are motivated by race or one of the other protected characteristics.
It follows that the FHA does not authorize disparate-impact suits. Under a statute like the FHA that prohibits actions taken "because of" protected characteristics, intent makes all the difference. Disparate impact, however, does not turn on " 'subjective intent.' " Raytheon Co. v. Hernandez,540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). Instead, " 'treat[ing] [a] particular person less favorably than others because of' a protected trait" is " 'disparate treatment,' " not disparate impact. Ricci,557 U.S., at 577, 129 S.Ct. 2658(emphasis added). See *2535 also, e.g.,Personnel Administrator of Mass. v. Feeney,442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)(explaining the difference between "because of" and "in spite of"); Hernandez v. New York,500 U.S. 352, 359-360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)(plurality opinion) (same); Alexander v. Sandoval,532 U.S. 275, 278, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)(holding that it is "beyond dispute" that banning discrimination " 'on the ground of race' " "prohibits only intentional discrimination").
This is precisely how Congress used the phrase "because of" elsewhere in the FHA. The FHA makes it a crime to willfully "interfere with ... any person because of his race" (or other protected characteristic) who is engaging in a variety of real-estate-related activities, such as "selling, purchasing, [or] renting" a dwelling. 42 U.S.C. § 3631(a). No one thinks a defendant could be convicted of this crime without proof that he acted "because of," i.e.,on account of or by reason of, one of the protected characteristics. But the critical language in this section-"because of"-is identical to the critical language in the sections at issue in this case. "One ordinarily assumes" Congress means the same words in the same statute to mean the same thing. Utility Air Regulatory Group v. EPA,573 U.S. ----, ----, 134 S.Ct. 2427, 2441-2442, 189 L.Ed.2d 372 (2014). There is no reason to doubt that ordinary assumption here.
Like the FHA, many other federal statutes use the phrase "because of" to signify what that phrase means in ordinary speech. For instance, the federal hate crime statute, 18 U.S.C. § 249, authorizes enhanced sentences for defendants convicted of committing certain crimes "because of" race, color, religion, or other listed characteristics. Hate crimes require bad intent-indeed, that is the whole point of these laws. See, e.g.,Wisconsin v. Mitchell,508 U.S. 476, 484-485, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993)("[T]he same criminal conduct may be more heavily punished if the victim is selected because of his race or other protected status"). All of this confirms that "because of" in the FHA should be read to mean what it says.
B
In an effort to find at least a sliver of support for disparate-impact liability in the text of the FHA, the principal respondent, the Solicitor General, and the Court pounce on the phrase "make unavailable." Under § 804(a), it is unlawful "[t]o ... make unavailable ... a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). See also § 3605(a)(barring "discriminat[ion] against any person in making available such a [housing] transaction ... because of race, color, religion, sex, handicap, familial status, or national origin"). The Solicitor General argues that "[t]he plain meaning of the phrase 'make unavailable' includes actions that have the resultof making housing or transactions unavailable, regardless of whether the actions were intended to have that result." Brief for United States as Amicus Curiae18 (emphasis added). This argument is not consistent with ordinary English usage.
It is doubtful that the Solicitor General's argument accurately captures the "plain meaning" of the phrase "make unavailable" even when that phrase is not linked to the phrase "because of." "[M]ake unavailable" must be viewed together with the rest of the actions covered by § 804(a), which applies when a party "refuse[s]to sell or rent" a dwelling, "refuse[s]to negotiate for the sale or rental" of a dwelling, "den[ies]a dwelling to any person," "or otherwise make[s] unavailable" a dwelling.
*2536 § 3604(a)(emphasis added). When a statute contains a list like this, we "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.' " Gustafson v. Alloyd Co.,513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)(quoting Jarecki v. G.D. Searle & Co.,367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). See also, e.g.,Yates v. United States,574 U.S. ----, ----, 135 S.Ct. 1074, 1085-1086, 191 L.Ed.2d 64 (2015)(plurality opinion); ibr.US_Case_Law.Schema.Case_Body:v1">id., at ----, 135 S.Ct., at 1089(ALITO, J., concurring in judgment). Here, the phrases that precede "make unavailable" unmistakably describe intentionaldeprivations of equal treatment, not merely actions that happen to have a disparate effect. See American Ins. Assn.,--- F.Supp.3d, at ----, 2014 WL 5802283, at *8(citing Webster's Third New International Dictionary 603, 848, 1363, 1910 (1966)). Section 804(a), moreover, prefaces "make unavailable" with "or otherwise," thus creating a catchall. Catchalls must be read "restrictively" to be "like" the listed terms. Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler,537 U.S. 371, 384-385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). The result of these ordinary rules of interpretation is that even without "because of," the phrase "make unavailable" likely would require intentionality.
The FHA's inclusion of "because of," however, removes any doubt. Sections 804(a) and 805(a) apply only when a party makes a dwelling or transaction unavailable "because of" race or another protected characteristic. In ordinary English usage, when a person makes something unavailable "because of" some factor, that factor must be a reason for the act.
Here is an example. Suppose that Congress increases the minimum wage. Some economists believe that such legislation reduces the number of jobs available for "unskilled workers," Fuller & Geide-Stevenson, Consensus Among Economists: Revisited, 34 J. Econ. Educ. 369, 378 (2003), and minorities tend to be disproportionately represented in this group, see, e.g., Dept. of Commerce, Bureau of Census, Detailed Years of School Completed by People 25 Years and Over by Sex, Age Groups, Race and Hispanic Origin: 2014, online at http://www.census.gov/hhes/socdemo/education/data/cps/2014/tables.html (all Internet materials as visited June 23, 2015, and available in Clerk of Court's case file). Assuming for the sake of argument that these economists are correct, would it be fair to say that Congress made jobs unavailable to African-Americans or Latinos "because of" their race or ethnicity?
A second example. Of the 32 college players selected by National Football League (NFL) teams in the first round of the 2015 draft, it appears that the overwhelming majority were members of racial minorities. See Draft 2015, http://www.nfl.com/draft/2015. See also Miller, Powerful Sports Agents Representing Color, Los Angeles Sentinel, Feb. 6, 2014, p. B3 (noting "there are 96 players (76 of whom are African-American) chosen in the first rounds of the 2009, 2010, and 2011 NFL drafts"). Teams presumably chose the players they think are most likely to help them win games. Would anyone say the NFL teams made draft slots unavailable to white players "because of" their race?
A third example. During the present Court Term, of the 21 attorneys from the Solicitor General's Office who argued cases in this Court, it appears that all but 5(76%) were under the age of 45. Would the Solicitor General say he made argument opportunities unavailable to older attorneys "because of" their age?
*2537 The text of the FHA simply cannot be twisted to authorize disparate-impact claims. It is hard to imagine how Congress could have more clearly stated that the FHA prohibits only intentional discrimination than by forbidding acts done "because of race, color, religion, sex, familial status, or national origin."
II
The circumstances in which the FHA was enacted only confirm what the text says. In 1968, "the predominant focus of antidiscrimination law was on intentional discrimination." Smith v. City of Jackson,544 U.S. 228, 258, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005)(O'Connor, J., concurring in judgment). The very "concept of disparate impact liability, by contrast, was quite novel." Ibid.(collecting citations). See also Tr. of Oral Arg. 15 ("JUSTICE GINSBURG: ... If we're going to be realistic about this, ... in 1968, when the Fair Housing Act passed, nobody knew anything about disparate impact"). It is anachronistic to think that Congress authorized disparate-impact claims in 1968 but packaged that striking innovation so imperceptibly in the FHA's text.
Eradicating intentional discrimination was and is the FHA's strategy for providing fair housing opportunities for all. The Court recalls the country's shameful history of segregation and de jurehousing discrimination and then jumps to the conclusion that the FHA authorized disparate-impact claims as a method of combatting that evil. Ante,at 2534 - 2536. But the fact that the 1968 Congress sought to end housing discrimination says nothing about the means it devised to achieve that end. The FHA's text plainly identifies the weapon Congress chose-outlawing disparate treatment "because of race" or another protected characteristic. 42 U.S.C. §§ 3604(a), 3605(a). Accordingly, in any FHA claim, "[p]roof of discriminatory motive is critical." Teamsters,431 U.S., at 335, n. 15, 97 S.Ct. 1843.
III
Congress has done nothing since 1968 to change the meaning of the FHA prohibitions at issue in this case. In 1968, those prohibitions forbade certain housing practices if they were done "because of" protected characteristics. Today, they still forbid certain housing practices if done "because of" protected characteristics. The meaning of the unaltered language adopted in 1968 has not evolved.
Rather than confronting the plain text of §§ 804(a) and 805(a), the Solicitor General and the Court place heavy reliance on certain amendments enacted in 1988, but those amendments did not modify the meaning of the provisions now before us. In the Fair Housing Amendments Act of 1988, 102 Stat. 1619, Congress expanded the list of protected characteristics. See 42 U.S.C. §§ 3604(a), (f)(1). Congress also gave the Department of Housing and Urban Development (HUD) rulemaking authority and the power to adjudicate certain housing claims. See §§ 3612, 3614a. And, what is most relevant for present purposes, Congress added three safe-harbor provisions, specifying that "[n]othing in [the FHA]" prohibits (a) certain actions taken by real property appraisers, (b) certain occupancy requirements, and (c) the treatment of persons convicted of manufacturing or distributing illegal drugs.[3]
*2538 According to the Solicitor General and the Court, these amendments show that the FHA authorizes disparate-impact claims. Indeed, the Court says that they are "of crucial importance." Ante,at 2519. This "crucial" argument, however, cannot stand.
A
The Solicitor General and the Court contend that the 1988 Congress implicitly authorized disparate-impact liability by adopting the amendments just noted while leaving the operative provisions of the FHA untouched. Congress knew at that time, they maintain, that the Courts of Appeals had held that the FHA sanctions disparate-impact claims, but Congress failed to enact bills that would have rejected that theory of liability. Based on this, they submit that Congress silently ratified those decisions. See ante,at 2519 - 2520; Brief for United States as Amicus Curiae23-24. This argument is deeply flawed.
Not the greatest of its defects is its assessment of what Congress must have known about the judiciary's interpretation of the FHA. The Court writes that by 1988, "all nine Courts of Appealsto have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims." Ante,at 2519 (emphasis added). See also Brief for United States as Amicus Curiae12. But this Court had not addressed that question. While we always give respectful consideration to interpretations of statutes that garner wide acceptance in other courts, this Court has "no warrant to ignore clear statutory language on the ground that other courts have done so," even if they have " 'consistently' " done so for " '30 years.' " Milner v. Department of Navy,562 U.S. 562, 575-576, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011). See also, e.g.,CSX Transp., Inc. v. McBride,564 U.S. ----, ----, 131 S.Ct. 2630, 2650, 180 L.Ed.2d 637 (2011)(ROBERTS, C.J., dissenting) (explaining that this Court does not interpret statutes by asking for "a show of hands" (citing Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); McNally v. United States,483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987))).
In any event, there is no need to ponder whether it would have been reasonable for the 1988 Congress, without considering the clear meaning of §§ 804(a) and 805(a), to assume that the decisions of the lower courts effectively settled the matter. While the Court highlights the decisions of the Courts of Appeals, it fails to mention something that is of at least equal importance: The official view of the United States in 1988.
Shortly beforethe 1988 amendments were adopted, the United States formally argued in this Court that the FHA prohibits only intentional discrimination. See Brief for United States as Amicus Curiaein Huntington v. Huntington Branch, NAACP,O.T. 1988, No. 87-1961, p. 15 ("An action taken because of some factor other than race, i.e.,financial means, even if it causes a discriminatory effect, is not *2539 an example of the intentional discrimination outlawed by the statute"); id.,at 14 ("The words 'because of' plainly connote a causal connection between the housing-related action and the person's race or color").[4]This was the same position that the United States had taken in lower courts for years. See, e.g., United States v. Birmingham,538 F.Supp. 819, 827, n. 9 (E.D.Mich.1982)(noting positional change), aff'd, 727 F.2d 560, 565-566 (C.A.6 1984)(adopting United States' "concession" that there must be a " 'discriminatory motive' "). It is implausible that the 1988 Congress was aware of certain lower court decisions but oblivious to the United States' considered and public view that those decisions were wrong.
This fact is fatal to any notion that Congress implicitly ratified disparate impact in 1988. The canon of interpretation on which the Court and the Solicitor General purport to rely-the so-called "prior-construction canon"-does not apply where lawyers cannot "justifiably regard the point as settled" or when "other sound rules of interpretation" are implicated. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 324, 325 (2012). That was the case here. Especially after the United States began repudiating disparate impact, no one could have reasonably thought that the question was settled.
Nor can such a faulty argument be salvaged by pointing to Congress' failure in 1988 to enact language that would have made it clear that the FHA does not authorize disparate-impact suits based on zoning decisions. See ante,at 2519 - 2520.[5]To change the meaning of language in an already enacted law, Congress must pass a new law amending that language. See, e.g., West Virginia Univ. Hospitals, Inc. v. Casey,499 U.S. 83, 100, 101, and n. 7, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Intent that finds no expression in a statute is irrelevant. See, e.g., New York Telephone Co. v. New York State Dept. of Labor,440 U.S. 519, 544-545, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979); Easterbrook, Statutes' Domains, 50 U. Chi. L. Rev. 533, 538-540 (1983). Hence, "we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." Helvering v. Hallock,309 U.S. 106, 121, 60 S.Ct. 444, 84 L.Ed. 604 (1940).
Unsurprisingly, we have rejected identicalarguments about implicit ratification in other cases. For example, in *2540 Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), a party argued that § 10(b) of the Securities Exchange Act of 1934 imposes liability on aiders and abettors because "Congress ha[d] amended the securities laws on various occasions since 1966, when courts first began to interpret § 10(b) to cover aiding and abetting, but ha[d] done so without providing that aiding and abetting liability is not available under § 10(b)." Id., at 186, 114 S.Ct. 1439. "From that," a party asked the Court to "infer that these Congresses, by silence, ha[d] acquiesced in the judicial interpretation of § 10(b)." Ibid.The Court dismissed this argument in words that apply almost verbatim here:
" 'It does not follow that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is "impossible to assert with any degree of assurance that congressional failure to act represents" affirmative congressional approval of the courts' statutory interpretation. Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. See U.S. Const., Art. I, § 7, cl. 2. Congressional inaction cannot amend a duly enacted statute.' Patterson v. McLean Credit Union,491 U.S. 164, 175, n. 1 [109 S.Ct. 2363, 105 L.Ed.2d 132] (1989)(quoting Johnson v. Transportation Agency, Santa Clara Cty., 480 U.S. 616, 672 [107 S.Ct. 1442, 94 L.Ed.2d 615] (1987)(SCALIA, J., dissenting))." Ibid.(alterations omitted).
We made the same point again in Sandoval,532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517. There it was argued that amendments to Title VI of the Civil Rights Act of 1964 implicitly ratified lower court decisions upholding a private right of action. We rejected that argument out of hand. See id.,at 292-293, 121 S.Ct. 1511.
Without explanation, the Court ignores these cases.
B
The Court contends that the 1988 amendments provide "convincing confirmation of Congress' understanding that disparate-impact liability exists under the FHA" because the three safe-harbor provisions included in those amendments "would be superfluous if Congress had assumed that disparate-impact liability did not exist under the FHA." Ante,at 2520, 2521. As just explained, however, what matters is what Congress did,not what it might have "assumed." And although the Court characterizes these provisions as "exemptions," that characterization is inaccurate. They make no reference to § 804(a) or § 805(a) or any other provision of the FHA; nor do they state that they apply to conduct that would otherwise be prohibited. Instead, they simply make clear that certain conduct is not forbidden by the Act. E.g., 42 U.S.C. § 3607(b)(4)("Nothing in this subchapter prohibits ..."). The Court should read these amendments to mean what they say.
In 1988, policymakers were not of one mind about disparate-impact housing suits. Some favored the theory and presumably would have been happy to have it enshrined in the FHA. See ante,at 2519 - 2520; 134 Cong. Rec. 23711 (1988) (statement of Sen. Kennedy). Others worried about disparate-impact liability and recognized that this Court had not decided whether disparate-impact claims were authorized under the 1968 Act. See H.R.Rep. No. 100-711, pp. 89-93 (1988). Still others disapproved of disparate-impact liability and believed that the 1968 Act did not authorize it. That was the view of President Reagan when he signed the amendments. See Remarks on Signing the Fair Housing Amendments Act of *2541 1988, 24 Weekly Comp. of Pres. Doc. 1140, 1141 (1988) (explaining that the amendments did "not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [FHA] violations may be established by a showing of disparate impact" because the FHA "speaks only to intentional discrimination").[6]
The 1988 safe-harbor provisions have all the hallmarks of a compromise among these factions. These provisions neither authorize nor bar disparate-impact claims, but they do provide additional protection for persons and entities engaging in certain practices that Congress especially wished to shield. We "must respect and give effect to these sorts of compromises." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 93-94, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002).
It is not hard to see why such a compromise was attractive. For Members of Congress who supported disparate impact, the safe harbors left the favorable lower court decisions in place. And for those who hoped that this Court would ultimately agree with the position being urged by the United States, those provisions were not surplusage. In the Circuits in which disparate-impact FHA liability had been accepted, the safe-harbor provisions furnished a measure of interim protection until the question was resolved by this Court. They also provided partial protection in the event that this Court ultimately rejected the United States' argument. Neither the Court, the principal respondent, nor the Solicitor General has cited any case in which the canon against surplusage has been applied in circumstances like these.[7]
*2542 On the contrary, we have previously refused to interpret enactments like the 1988 safe-harbor provisions in such a way. Our decision in O'Gilvie v. United States,519 U.S. 79, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996)-also ignored by the Court today-is instructive. In that case, the question was whether a provision of the Internal Revenue Code excluding a recovery for personal injury from gross income applied to punitive damages. Well after the critical provision was enacted, Congress adopted an amendment providing that punitive damages for nonphysical injuries were not excluded. Pointing to this amendment, a taxpayer argued: "Why ... would Congress have enacted this amendment removing punitive damages (in nonphysical injury cases) unless Congress believed that, in the amendment's absence, punitive damages did fall within the provision's coverage?" Id.,at 89, 117 S.Ct. 452. This argument, of course, is precisely the same as the argument made in this case. To paraphrase O'Gilvie,the Court today asks: Why would Congress have enacted the 1988 amendments, providing safe harbors from three types of disparate-impact claims, unless Congress believed that, in the amendments' absence, disparate-impact claims did fall within the FHA's coverage?
The Court rejected the argument in O'Gilvie. "The short answer," the Court wrote, is that Congress might have simply wanted to "clarify the matter in respect to nonphysical injuries" while otherwise "leav[ing] the law where it found it." Ibid.Although other aspects of O'Gilvietriggered a dissent, see id.,at 94-101, 117 S.Ct. 452(opinion of SCALIA, J.), no one quarreled with this self-evident piece of the Court's analysis. Nor was the O'GilvieCourt troubled that Congress' amendment regarding nonphysical injuries turned out to have been unnecessary because punitive damages for any injuries were not excluded all along.
The Court saw the flaw in the argument in O'Gilvie,and the same argument is no better here. It is true that O'Gilvieinvolved a dry question of tax law while this case involves a controversial civil rights issue. But how we read statutes should not turn on such distinctions.
In sum, as the principal respondent's attorney candidly admitted, the 1988 amendments did not create disparate-impact liability. See Tr. of Oral Arg. 36 ("[D]id the things that [Congress] actually did in 1988 expand the coverage of the Act? MR. DANIEL: No, Justice").
C
The principal respondent and the Solicitor General-but not the Court-have one final argument regarding the text of the FHA. They maintain that even if the FHA does not unequivocally authorize disparate-impact suits, it is at least ambiguous enough to permit HUD to adopt that interpretation. Even if the FHA were ambiguous, however, we do not defer "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.' " Christopher v. SmithKline Beecham Corp.,567 U.S. ----, ----, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012).
Here, 43 years after the FHA was enacted and nine days after the Court granted certiorari in Magner(the "rodent infestation" case), HUD proposed "to prohibit *2543 housing practices with a discriminatory effect, even where there has been no intent to discriminate."Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed.Reg. 70921 (2011). After Magnersettled, the Court called for the views of the Solicitor General in Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.,568 U.S. ----, 133 S.Ct. 569, 184 L.Ed.2d 336 (2012), another case raising the same question. Before the Solicitor General filed his brief, however, HUD adopted disparate-impact regulations. See Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed.Reg. 11460 (2013). The Solicitor General then urged HUD's rule as a reason to deny certiorari. We granted certiorari anyway, 570 U.S. ----, 133 S.Ct. 2824, 186 L.Ed.2d 883 (2013), and shortly thereafter Mount Hollyalso unexpectedly settled. Given this unusual pattern, there is an argument that deference may be unwarranted. Cf. Young v. United Parcel Service, Inc.,575 U.S. ----, ----, 135 S.Ct. 1338, 1352, 191 L.Ed.2d 279 (2015)(refusing to defer where "[t]he EEOC promulgated its 2014 guidelines only recently, after this Court had granted certiorari" (discussing Skidmore v. Swift & Co.,323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944))).[8]
There is no need to dwell on these circumstances, however, because deference is inapt for a more familiar reason: The FHA is not ambiguous. The FHA prohibits only disparate treatment, not disparate impact. It is a bedrock rule that an agency can never "rewrite clear statutory terms to suit its own sense of how the statute should operate." Utility Air Regulatory Group,573 U.S., at ----, 134 S.Ct., at 2446. This rule makes even more sense where the agency's view would open up a deeply disruptive avenue of liability that Congress never contemplated.
IV
Not only does disparate-impact liability run headlong into the text of the FHA, it also is irreconcilable with our precedents. The Court's decision today reads far too much into Griggs v. Duke Power Co.,401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and far too little into Smith v. City of Jackson,544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). In Smith,the Court explained that the statutory justification for the decision in Griggsdepends on language that has no parallel in the FHA. And when the SmithCourt addressed a provision that does have such a parallel in the FHA, the Court concluded-unanimously-that it does not authorize disparate-impact liability. The same result should apply here.
A
Rather than focusing on the text of the FHA, much of the Court's reasoning today turns on Griggs. In Griggs,the Court held that black employees who sued their employer under § 703(a)(2) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(2), could recover without proving that the employer's conduct-requiring a high school diploma or a qualifying grade on a standardized test as a condition for certain jobs-was motivated by a discriminatory intent. Instead, the Court held that, unless it was proved that the requirements were "job related," the plaintiffs could recover by showing that *2544 the requirements "operated to render ineligible a markedly disproportionate number of Negroes." 401 U.S., at 429, 91 S.Ct. 849.
Griggswas a case in which an intent to discriminate might well have been inferred. The company had "openly discriminated on the basis of race" prior to the date on which the 1964 Civil Rights Act took effect. Id., at 427, 91 S.Ct. 849. Once that date arrived, the company imposed new educational requirements for those wishing to transfer into jobs that were then being performed by white workers who did not meet those requirements.Id., at 427-428, 91 S.Ct. 849. These new hurdles disproportionately burdened African-Americans, who had "long received inferior education in segregated schools." Id., at 430, 91 S.Ct. 849. Despite all this, the lower courts found that the company lacked discriminatory intent. See ibr.US_Case_Law.Schema.Case_Body:v1">id., at 428, 91 S.Ct. 849. By convention, we do not overturn a finding of fact accepted by two lower courts, see, e.g.,Rogers v. Lodge,458 U.S. 613, 623, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); Blau v. Lehman,368 U.S. 403, 408-409, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672 (1949), so the Court was confronted with the question whether Title VII always demands intentional discrimination.
Although Griggsinvolved a question of statutory interpretation, the body of the Court's opinion-quite remarkably-does not even cite the provision of Title VII on which the plaintiffs' claims were based. The only reference to § 703(a)(2) of the 1964 Civil Rights Act appears in a single footnote that reproduces the statutory text but makes no effort to explain how it encompasses a disparate-impact claim. See 401 U.S., at 426, n. 1, 91 S.Ct. 849. Instead, the Court based its decision on the "objective" of Title VII, which the Court described as "achiev[ing] equality of employment opportunities and remov[ing] barriers that have operated in the past to favor an identifiable group of white employees over other employees." Id., at 429-430, 91 S.Ct. 849.
That text-free reasoning caused confusion, see, e.g., Smith, supra,at 261-262, 125 S.Ct. 1536(O'Connor, J., concurring in judgment), and undoubtedly led to the pattern of Court of Appeals decisions in FHA cases upon which the majority now relies. Those lower courts, like the GriggsCourt, often made little effort to ground their decisions in the statutory text. For example, in one of the earliest cases in this line, United States v. Black Jack,508 F.2d 1179 (C.A.8 1974), the heart of the court's analysis was this: "Just as Congress requires 'the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification,' such barriers must also give way in the field of housing." Id.,at 1184(quoting Griggs, supra,at 430-431, 91 S.Ct. 849; citation omitted).
Unlike these lower courts, however, this Court has never interpreted Griggsas imposing a rule that applies to all antidiscrimination statutes. See, e.g., Guardians Assn. v. Civil Serv. Comm'n of New York City,463 U.S. 582, 607, n. 27, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)(holding that Title VI, 42 U.S.C. § 2000d et seq.,does "not allow compensatory relief in the absence of proof of discriminatory intent"); Sandoval,532 U.S., at 280, 121 S.Ct. 1511(similar). Indeed, we have never held that Griggseven establishes a rule for all employmentdiscrimination statutes. In Teamsters,the Court rejected "the Griggsrationale" in evaluating a company's seniority rules. 431 U.S., at 349-350, 97 S.Ct. 1843. And because Griggswas focused *2545 on a particular problem, the Court had held that its rule does not apply where, as here, the context is different. In Los Angeles Dept. of Water and Power v. Manhart,435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), for instance, the Court refused to apply Griggsto pensions under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)or Title VII, even if a plan has a "disproportionately heavy impact on male employees." 435 U.S. at 711, n. 20, 98 S.Ct. 1370. We explained that "[e]ven a completely neutral practice will inevitably have somedisproportionate impact on one group or another. Griggsdoes not imply, and this Court has never held, that discrimination must always be inferred from such consequences." Ibid.
B
Although the opinion in Griggsdid not grapple with the text of the provision at issue, the Court was finally required to face that task in Smith,544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410, which addressed whether the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq.,authorizes disparate-impact suits. The Court considered two provisions of the ADEA, §§ 4(a)(1) and 4(a)(2), 29 U.S.C. §§ 623(a)(1)and (a)(2).
The Court unanimously agreed that the first of these provisions, § 4(a)(1), does not authorize disparate-impact claims. See 544 U.S., at 236, n. 6, 125 S.Ct. 1536(plurality opinion); id., at 243, 125 S.Ct. 1536(SCALIA, J., concurring in part and concurring in judgment) (agreeing with the plurality's reasoning); id., at 249, 125 S.Ct. 1536(O'Connor, J., concurring in judgment) (reasoning that this provision "obvious[ly]" does not allow disparate-impact claims).
By contrast, a majority of the Justices found that the terms of § 4(a)(2) either clearly authorize disparate-impact claims (the position of the plurality) or at least are ambiguous enough to provide a basis for deferring to such an interpretation by the Equal Employment Opportunity Commission (the position of Justice SCALIA). See 544 U.S., at 233-240, 125 S.Ct. 1536(plurality opinion); id., at 243-247, 125 S.Ct. 1536(opinion of SCALIA, J.).
In reaching this conclusion, these Justices reasoned that § 4(a)(2) of the ADEA was modeled on and is virtually identical to the provision in Griggs,42 U.S.C. § 2000e-2(a)(2). Section 4(a)(2) provides as follows:
"It shall be unlawful for an employer-
. . . . .
"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(emphasis added).
The provision of Title VII at issue in Griggssays this:
"It shall be an unlawful employment practice for an employer-
. . . . .
"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2)(emphasis added).
For purposes here, the only relevant difference between these provisions is that the ADEA provision refers to "age" and the Title VII provision refers to "race, color, religion, or national origin." Because identical language in two statutes *2546 having similar purposes should generally be presumed to have the same meaning, the plurality in Smith,echoed by Justice SCALIA, saw Griggsas "compelling" support for the conclusion that § 4(a)(2) of the ADEA authorizes disparate-impact claims. 544 U.S., at 233-234, 125 S.Ct. 1536(plurality opinion) (citing Northcross v. Board of Ed. of Memphis City Schools,412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973)(per curiam)).
When it came to the other ADEA provision addressed in Smith,namely, § 4(a)(1), the Court unanimously reached the opposite conclusion. Section 4(a)(1) states:
"It shall be unlawful for an employer-
"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1)(emphasis added).
The plurality opinion's reasoning, with which Justice SCALIA agreed, can be summarized as follows. Under § 4(a)(1), the employermust act because of age, and thus must have discriminatory intent. See 544 U.S., at 236, n. 6, 125 S.Ct. 1536.[9]Under § 4(a)(2), on the other hand, it is enough if the employer's actions"adversely affect" an individual "because of ... age." 29 U.S.C. § 623(a).
This analysis of §§ 4(a)(1) and (a)(2) of the ADEA confirms that the FHA does not allow disparate-impact claims. Sections 804(a) and 805(a) of the FHA resemble § 4(a)(1) of the ADEA, which the SmithCourt unanimously agreed does not encompass disparate-impact liability. Under these provisions of the FHA, like § 4(a)(1) of the ADEA, a defendant must act "because of" race or one of the other prohibited grounds. That is, it is unlawful for a person or entity to "[t]o refuse to sell or rent," "refuse to negotiate," "otherwise make unavailable," etc. for a forbidden reason. These provisions of the FHA, unlike the Title VII provision in Griggsor § 4(a)(2) of the ADEA, do not make it unlawful to take an action that happens to adversely affect a person because of race, religion, etc.
The Smithplurality's analysis, moreover, also depended on other language, unique to the ADEA, declaring that "it shall not be unlawful for an employer 'to take any action otherwise prohibited... where the differentiation is based on reasonable factors other than age.' " 544 U.S., at 238, 125 S.Ct. 1536(quoting 81 Stat. 603; emphasis added). This "otherwise prohibited" language was key to the plurality opinion's reading of the statute because it arguably suggested disparate-impact liability. See 544 U.S., at 238, 125 S.Ct. 1536. This language, moreover, was essentialto Justice SCALIA's controlling *2547 opinion. Without it, Justice SCALIA would have agreed with Justices O'Connor, KENNEDY, and THOMAS that nothingin the ADEA authorizes disparate-impact suits. See id.,at 245-246, 125 S.Ct. 1536. In fact, even with this "otherwise prohibited" language, Justice SCALIA merely concluded that § 4(a)(2) was ambiguous-notthat disparate-impacts suits are required. Id.,at 243, 125 S.Ct. 1536.
The FHA does not contain any phrase like "otherwise prohibited." Such language certainly is nowhere to be found in §§ 804(a) and 805(a). And for all the reasons already explained, the 1988 amendments do not presuppose disparate-impact liability. To the contrary, legislative enactments declaring only that certain actions are notgrounds for liability do not implicitly create a new theory of liability that all other facets of the statute foreclose.
C
This discussion of our cases refutes any notion that "[t]ogether, Griggsholds[10]and the plurality in Smithinstructs that antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." Ante,at 2517. The Court stumbles in concluding that § 804(a) of the FHA is more like § 4(a)(2) of the ADEA than § 4(a)(1). The operative language in § 4(a)(1) of the ADEA-which, per Smith,does not authorize disparate-impact claims-is materially indistinguishable from the operative language in § 804(a) of the FHA.
Even more baffling, neither alone nor in combination do Griggsand Smithsupport the Court's conclusion that § 805(a) of the FHA allows disparate-impact suits. The action forbidden by that provision is "discriminat[ion]... because of" race, religion, etc. 42 U.S.C. § 3605(a)(emphasis added). This is precisely the formulation used in § 4(a)(1) of the ADEA, which prohibits "discriminat[ion]... because of such individual's age," 29 U.S.C. § 623(a)(1)(emphasis added), and which Smithholds does notauthorize disparate-impact claims.
In an effort to explain why § 805(a)'s reference to "discrimination" allows disparate-impact suits, the Court argues that in Board of Ed. of City School Dist. of New York v. Harris,444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979), "statutory language similar to § 805(a) [was construed] to include disparate-impact liability." Ante,at 2518. In fact, the statutory language in Harriswas quite different. The law there was § 706(d)(1)(B) of the 1972 Emergency School Aid Act, which barred assisting education agencies that " 'had in effect any practice, policy, or procedure which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation ... orotherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees.' " 444 U.S., at 132-133, 142, 100 S.Ct. 363(emphasis added).
After stating that the first clause in that unusual statute referred to a "disparate- *2548 impact test," the HarrisCourt concluded that "a similar standard" should apply to the textually "closely connected" second clause. Id.,at 143, 100 S.Ct. 363. This was so, the Court thought, even though the second clause, standing alone, may very well have required discriminatory "intent." Id.,at 139, 100 S.Ct. 363. The Court explained that the Act's "less than careful draftsmanship" regarding the relationship between the clauses made the "wording of the statute ... ambiguous" about teacher assignments, thus forcing the Court to "look closely at the structure and context of the statute and to review its legislative history." Id.,at 138-140, 100 S.Ct. 363. It was the combined force of all those markers that persuaded the Court that disparate impact applied to the second clause too.
Harris,in other words, has nothing to do with § 805(a) of the FHA. The "wording" is different; the "structure" is different; the "context" is different; and the "legislative history" is different. Id.,at 140, 100 S.Ct. 363. Rather than digging up a 36-year-old case that Justices of this Court have cited all of twice, and never once for the proposition offered today, the Court would do well to recall our many cases explaining what the phase "because of" means.
V
Not only is the decision of the Court inconsistent with what the FHA says and our precedents, it will have unfortunate consequences. Disparate-impact liability has very different implications in housing and employment cases.
Disparate impact puts housing authorities in a very difficult position because programs that are designed and implemented to help the poor can provide the grounds for a disparate-impact claim. As Magnershows, when disparate impact is on the table, even a city's good-faith attempt to remedy deplorable housing conditions can be branded "discriminatory." 619 F.3d, at 834. Disparate-impact claims thus threaten "a whole range of tax, welfare, public service, regulatory, and licensing statutes." Washington v. Davis,426 U.S. 229, 248, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
This case illustrates the point. The Texas Department of Housing and Community Affairs (the Department) has only so many tax credits to distribute. If it gives credits for housing in lower income areas, many families-including many minority families-will obtain better housing. That is a good thing. But if the Department gives credits for housing in higher income areas, some of those families will be able to afford to move into more desirable neighborhoods. That is also a good thing. Either path, however, might trigger a disparate-impact suit.[11]
This is not mere speculation. Here, one respondent has sued the Department for not allocating enough credits to higher income areas. See Brief for Respondent Inclusive Communities Project, Inc., 23. But anotherrespondent argues that giving credits to wealthy neighborhoods violates "the moral imperative to improve the substandard and inadequate affordable housing in many of our inner cities." Reply Brief for Respondent Frazier Revitalization Inc. 1. This latter argument has special force because a city can build more housing where property is least expensive, thus benefiting more people. In fact, federal *2549 law often favors projects that revitalize low-income communities. Seeante,at 2513.
No matter what the Department decides, one of these respondents will be able to bring a disparate-impact case. And if the Department opts to compromise by dividing the credits, both respondents might be able to sue. Congress surely did not mean to put local governments in such a position.
The Solicitor General's answer to such problems is that HUD will come to the rescue. In particular, HUD regulations provide a defense against disparate-impact liability if a defendant can show that its actions serve "substantial, legitimate, nondiscriminatory interests" that "necessar[ily]" cannot be met by "another practice that has a less discriminatory effect." 24 CFR § 100.500(b) (2014). (There is, of course, no hint of anything like this defense in the text of the FHA. But then, there is no hint of disparate-impact liability in the text of the FHA either.)
The effect of these regulations, not surprisingly, is to confer enormous discretion on HUD-without actually solving the problem. What is a "substantial" interest? Is there a difference between a "legitimate" interest and a "nondiscriminatory" interest? To what degree must an interest be met for a practice to be "necessary"? How are parties and courts to measure "discriminatory effect"?
These questions are not answered by the Court's assurance that the FHA's disparate-impact "analysis 'is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.' " Ante,at 2514 (quoting 78 Fed.Reg. 11470). See also ante,at 2522 (likening the defense to "the business necessity standard"). The business-necessity defense is complicated enough in employment cases; what it means when plopped into the housing context is anybody's guess. What is the FHA analogue of "job related"? Is it "housing related"? But a vast array of municipal decisions affect property values and thus relate (at least indirectly) to housing. And what is the FHA analogue of "business necessity"? "Housing-policy necessity"? What does that mean?
Compounding the problem, the Court proclaims that "governmental entities ... must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes." Ante,at 2524. But what does the Court mean by a "legitimate" objective? And does the Court mean to say that there can be no disparate-impact lawsuit if the objective is "legitimate"? That is certainly not the view of the Government, which takes the position that a disparate-impact claim may be brought to challenge actions taken with such worthy objectives as improving housing in poor neighborhoods and making financially sound lending decisions. See Brief for United States as Amicus Curiae30, n. 7.
Because HUD's regulations and the Court's pronouncements are so "hazy," Central Bank,511 U.S., at 188-189, 114 S.Ct. 1439courts-lacking expertise in the field of housing policy-may inadvertently harm the very people that the FHA is meant to help. Local governments make countless decisions that may have some disparate impact related to housing. See ante,at 2522 - 2523. Certainly Congress did not intend to "engage the federal courts in an endless exercise of second-guessing" local programs. Canton v. Harris,489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
Even if a city or private entity named in a disparate-impact suit believes that it is likely to prevail if a disparate-impact suit *2550 is fully litigated, the costs of litigation, including the expense of discovery and experts, may "push cost-conscious defendants to settle even anemic cases." Bell Atlantic Corp. v. Twombly,550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Defendants may feel compelled to "abandon substantial defenses and ... pay settlements in order to avoid the expense and risk of going to trial." Central Bank, supra, at 189, 114 S.Ct. 1439. And parties fearful of disparate-impact claims may let race drive their decisionmaking in hopes of avoiding litigation altogether. Cf. Ricci,557 U.S., at 563, 129 S.Ct. 2658. All the while, similar dynamics may drive litigation against private actors. Ante,at 2522.
This is not the Fair Housing Act that Congress enacted.
VI
Against all of this, the Court offers several additional counterarguments. None is persuasive.
A
The Court is understandably worried about pretext. No one thinks that those who harm others because of protected characteristics should escape liability by conjuring up neutral excuses. Disparate-treatment liability, however, is attuned to this difficulty. Disparate impact can be evidenceof disparate treatment. E.g.,Church of Lukumi Babalu Aye, Inc. v. Hialeah,508 U.S. 520, 541-542, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)(opinion of KENNEDY, J.); Hunter v. Underwood,471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). As noted, the facially neutral requirements in Griggscreated a strong inference of discriminatory intent. Nearly a half century later, federal judges have decades of experience sniffing out pretext.
B
The Court also stresses that "many of our Nation's largest cities-entities that are potential defendants in disparate-impact suits-have submitted an amicusbrief in this case supporting disparate-impact liability under the FHA." Ante,at 2525 - 2526.
This nod to federalism is puzzling. Only a minority of the States and only a small fraction of the Nation's municipalities have urged us to hold that the FHA allows disparate-impact suits. And even if a majority supported the Court's position, that would not be a relevant consideration for a court. In any event, nothing prevents States and local government from enacting their own fair housing laws, including laws creating disparate-impact liability. See 42 U.S.C. § 3615(recognizing local authority).
The Court also claims that "[t]he existence of disparate-impact liability in the substantial majority of the Courts of Appeals for the last several decades" has not created " 'dire consequences.' " Ante,at 2526. But the Court concedes that disparate impact can be dangerous. See ante,at 2522 - 2525. Compare Magner,619 F.3d, at 833-838(holding that efforts to prevent violations of the housing code may violate the FHA), with 114 Cong. Rec. 2528 (1968) (remarks of Sen. Tydings) (urging enactment of the FHA to help combat violations of the housing code, including "rat problem[s]"). In the Court's words, it is "paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing." Ante, at 2522. Our say-so, however, will not stop such costly cases from being filed-or from getting past a motion to dismiss (and so into settlement).
C
At last I come to the "purpose" driving the Court's analysis: The desire to eliminate *2551 the "vestiges" of "residential segregation by race." Ante,at 2515, 2525. We agree that all Americans should be able "to buy decent houses without discrimination ... because ofthe color of their skin." 114 Cong. Rec. 2533 (remarks of Sen. Tydings) (emphasis added). See 42 U.S.C. §§ 3604(a), 3605(a)("because of race"). But this Court has no license to expand the scope of the FHA to beyond what Congress enacted.
When interpreting statutes, " '[w]hat the legislative intention was, can be derived only from the words ... used; and we cannot speculate beyond the reasonable import of these words.' " Nassar,570 U.S., at ----, 133 S.Ct., at 2528-2529(quoting Gardner v. Collins,2 Pet. 58, 93, 7 L.Ed. 347 (1829)). "[I]t frustrates rather than effectuates legislative intent simplistically to assume that whateverfurthers the statute's primary objective must be the law." Rodriguez v. United States,480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987)(per curiam). See also, e.g.,Board of Governors, FRS v. Dimension Financial Corp.,474 U.S. 361, 373-374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986)(explaining that " 'broad purposes' " arguments "ignor[e] the complexity of the problems Congress is called upon to address").
Here, privileging purpose over text also creates constitutional uncertainty. The Court acknowledges the risk that disparate impact may be used to "perpetuate race-based considerations rather than move beyond them." Ante,at 2524. And it agrees that "racial quotas ... rais[e] serious constitutional concerns." Ante,at 2523. Yet it still reads the FHA to authorize disparate-impact claims. We should avoid, rather than invite, such "difficult constitutional questions." Ante,at 2524. By any measure, the Court today makes a serious mistake.
* * *
I would interpret the Fair Housing Act as written and so would reverse the judgment of the Court of Appeals.

The current version of § 2000e-2(a)is almost identical, except that § 2000e-2(a)(2)makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employmentin any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (Emphasis added.) This change, which does not impact my analysis, was made in 1972. 86 Stat. 109.

In 1991, Congress added § 2000e-2(m)to Title VII, which permits a plaintiff to establish that an employer acted "because of" a protected characteristic by showing that the characteristic was "a motivating factor" in the employer's decision. Civil Rights Act of 1991, § 107(a), 105 Stat. 1075. That amended definition obviously does not legitimize disparate-impact liability, which is distinguished from disparate-treatment liability precisely because the former does not require any discriminatory motive.

Even "[f]ans ... of Griggs [v. Duke Power Co.,401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971),] tend to agree that the decision is difficult to square with the available indications of congressional intent." Lemos, The Consequences of Congress's Choice of Delegate: Judicial and Agency Interpretations of Title VII, 63 Vand. L. Rev. 363, 399, n. 155 (2010). In the words of one of the decision's defenders, Griggs"was poorly reasoned and vulnerable to the charge that it represented a significant leap away from the expectations of the enacting Congress." W. Eskridge, Dynamic Statutory Interpretation 78 (1994).

Efforts by Executive Branch officials to influence this Court's disparate-impact jurisprudence may not be a thing of the past. According to a joint congressional staff report, after we granted a writ of certiorari in Magner v. Gallagher,564 U.S. ----, 132 S.Ct. 548, 181 L.Ed.2d 395 (2011), to address whether the Fair Housing Act created disparate-impact liability, then-Assistant Attorney General Thomas E. Perez-now Secretary of Labor-entered into a secret deal with the petitioners in that case, various officials of St. Paul, Minnesota, to prevent this Court from answering the question. Perez allegedly promised the officials that the Department of Justice would not intervene in two qui tamcomplaints then pending against St. Paul in exchange for the city's dismissal of the case. See House Committee on Oversight and Government Reform, Senate Committee on the Judiciary, and House Committee on the Judiciary, DOJ's Quid Pro QuoWith St. Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule of Law, Joint Staff Report, 113th Cong., 1st Sess., pp. 1-2 (2013). Additionally, just nine days after we granted a writ of certiorari in Magner,and before its dismissal, the Department of Housing and Urban Development proposed the disparate-impact regulation at issue in this case. See 76 Fed.Reg. 70921 (2011).

It takes considerable audacity for today's majority to describe the origins of racial imbalances in housing, ante,at 2515 - 2516, without acknowledging this Court's role in the development of this phenomenon. In the past, we have admitted that the sweeping desegregation remedies of the federal courts contributed to " 'white flight' " from our Nation's cities, see Missouri v. Jenkins,515 U.S. 70, 95, n. 8, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995); id.,at 114, 115 S.Ct. 2038(THOMAS, J., concurring), in turn causing the racial imbalances that make it difficult to avoid disparate impact from housing development decisions. Today's majority, however, apparently is as content to rewrite history as it is to rewrite statutes.

We granted certiorari in Magner v. Gallagher,565 U.S. ----, 132 S.Ct. 548, 181 L.Ed.2d 395 (2011). Before oral argument, however, the parties settled. 565 U.S. ----, 132 S.Ct. 994, 1306, 181 L.Ed.2d 1035, 725 (2012). The same thing happened again in Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc., 571 U.S. ----, 133 S.Ct. 2824, 186 L.Ed.2d 883 (2013).

See al-Mujahed & Naylor, Rebels Assault Key Sites in Yemen, pp. A1, A12 ("A government official ... spoke on the condition of anonymity because of concern for his safety"); Berman, Jury Selection Starts in Colo. Shooting Trial, p. A2 ("Jury selection is expected to last four to five months because of a massive pool of potential jurors"); Davidson, Some VA Whistleblowers Get Relief From Retaliation, p. A18 ("In April, they moved to fire her because of an alleged 'lack of collegiality' "); Hicks, Post Office Proposes Hikes in Postage Rates, p. A19 ("The Postal Service lost $5.5 billion in 2014, in large part because of continuing declines in first-class mail volume"); Editorial, Last Responders, p. A20 ("Metro's initial emergency call mentioned only smoke but no stuck train [in part] ... because of the firefighters' uncertainty that power had been shut off to the third rail"); Letter to the Editor, Metro's Safety Flaws, p. A20 ("[A] circuit breaker automatically opened because of electrical arcing"); Bernstein, He Formed Swingle Singers and Made Bach Swing, p. B6 ("The group retained freshness because of the 'stunning musicianship of these singers' "); Schudel, TV Producer, Director Invented Instant Replay, p. B7 ("[The 1963 Army-Navy football game was] [d]elayed one week because of the assassination of President John F. Kennedy"); Contrera & Thompson, 50 Years On, Cheering a Civil Rights Matriarch, pp. C1, C5 ("[T]he first 1965 protest march from Selma to Montgomery ... became known as 'Bloody Sunday' because of state troopers' violent assault on the marchers"); Pressley, 'Life Sucks': Aaron Posner's Latest Raging Riff on Chekhov, pp. C1, C9 (" 'The Seagull' gave Posner ample license to experiment because of its writer and actress characters and its pronouncements on art"); A Rumpus on 'The Bachelor,' p. C2 ("Anderson has stood out from the pack ... mostly because of that post-production censoring of her nether regions" (ellipsis in original)); Steinberg, KD2DC, Keeping Hype Alive, pp. D1, D4 (explaining that a commenter "asked that his name not be used because of his real job"); Boren, Former FSU Boss Bowden Wants 12 Wins to Be Restored, p. D2 ("[T]he NCAA restored the 111 victories that were taken from the late Joe Paterno because of the Jerry Sandusky child sex-abuse scandal"); Oklahoma City Finally Moves Past .500 Mark, p. D4 ("Trail Blazers all-star LaMarcus Aldridge won't play in Wednesday night's game against the Phoenix Suns because of a left thumb injury").

These new provisions state:
"Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." § 3605(c).
"Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Nor does any provision in this subchapter regarding familial status apply with respect to housing for older persons." § 3607(b)(1).
"Nothing in this subchapter prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance as defined in section 802 of title 21." § 3607(b)(4).

In response to the United States' argument, we reserved decision on the question. See Huntington v. Huntington Branch, NAACP,488 U.S. 15, 18, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)(per curiam) ("Since appellants conceded the applicability of the disparate-impact test ... we do not reach the question whether that test is the appropriate one").

In any event, the Court overstates the importance of that failed amendment. The amendment's sponsor disavowed that it had anything to do with the broader question whether the FHA authorizes disparate-impact suits. Rather, it "left to caselaw and eventual Supreme Court resolution whether a discriminatory intent or discriminatory effects standard is appropriate ... [in] all situations but zoning." H.R.Rep. No. 100-711, p. 89(1988), 1988 U.S.C.C.A.N. 2173, 2224. Some in Congress, moreover, supported the amendment andthe House bill. Compare ibid.with 134 Cong. Rec. 16511 (1988). It is hard to believe they thought the bill-which was silent on disparate impact-nonetheless decided the broader question. It is for such reasons that failed amendments tell us "little" about what a statute means. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Footnotes in House Reports and law professor testimony tell us even less. Ante,at 2519 - 2520.

At the same hearings to which the Court refers, ante,at 2519, Senator Hatch stated that if the "intent test versus the effects test" were to "becom[e] an issue," a "fair housing law" might not be enacted at all, and he noted that failed legislation in the past had gotten "bogged down" because of that "battle." Fair Housing Amendments Act of 1987: Hearings on S. 558 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 100th Cong., 1st Sess., 5 (1987). He also noted that the bill under consideration did "not really go one way or the other" on disparate impact since the sponsors were content to "rely" on the lower court opinions. Ibid. And he emphasized that "the issue of intent versus effect-I am afraid that is going to have to be decided by the Supreme Court." Ibid. See also id.,at 2517 ("It is not always a violation to refuse to sell, but only to refuse to sell 'because of' another's race. This language made clear that the 90th Congress meant only to outlaw acts taken with the intent to discriminate.... To use any standard other than discriminatory intent ... would jeopardize many kinds of beneficial zoning and local ordinances" (statement of Sen. Hatch)).

In any event, even in disparate-treatment suits, the safe harbors are not superfluous. For instance, they affect "the burden-shifting framework" in disparate-treatment cases. American Ins. Assn. v. Department of Housing and Urban Development,--- F.Supp.3d ----, 2014 WL 5802283, *10 (D.D.C.2014). Under the second step of the burden-shifting scheme from McDonnell Douglas Corp. v. Green,411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which some courts have applied in disparate-treatment housing cases, see, e.g., 2922 Sherman Avenue Tenants' Assn. v. District of Columbia,444 F.3d 673, 682 (C.A.D.C.2006)(collecting cases), a defendant must proffer a legitimate reason for the challenged conduct, and the safe-harbor provisions set out reasons that are necessarily legitimate. Moreover, while a factfinder in a disparate-treatment case can sometimes infer bad intent based on facially neutral conduct, these safe harbors protect against such inferences. Without more, conduct within a safe harbor is insufficient to support such an inference as a matter of law. And finally, even if there is additional evidence, these safe harbors make it harder to show pretext. See Fair Housing Advocates Assn., Inc. v. Richmond Heights,209 F.3d 626, 636-637, and n. 7 (C.A.6 2000).
Even if they were superfluous, moreover, our "preference for avoiding surplusage constructions is not absolute." Lamie v. United States Trustee,540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). We "presume that a legislature says in a statute what it means," notwithstanding "[r]edundanc[y]." Connecticut Nat. Bank v. Germain,503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

At argument, the Government assured the Court that HUD did not promulgate its proposed rule because of Magner. See Tr. of Oral Arg. 46 ("[I]t overestimates the efficiency of the government to think that you could get, you know, a supposed rule-making on an issue like this out within seven days"). The Government also argued that HUD had recognized disparate-impact liability in adjudications for years. Ibid.

The plurality stated:
"Paragraph (a)(1) makes it unlawful for an employer 'to fail or refuse to hire ... any individual... because of such individual's age.' (Emphasis added.) The focus of the paragraph is on the employer's actions with respect to the targeted individual. Paragraph (a)(2), however, makes it unlawful for an employer 'to limit ... his employeesin any way which would deprive or tend to deprive any individualof employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.' (Emphasis added.) Unlike in paragraph (a)(1), there is thus an incongruity between the employer's actions-which are focused on his employees generally-and the individual employee who adversely suffers because of those actions. Thus, an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification adversely affects the employee because of that employee's age-the very definition of disparate impact." 544 U.S., at 236, n. 6, 125 S.Ct. 1536.

Griggs,of course, "holds" nothing of the sort. Indeed, even the plurality opinion in Smith(to say nothing of Justice SCALIA's controlling opinion or Justice O'Connor's opinion concurring in the judgment) did not understand Griggsto create such a rule. See 544 U.S., at 240, 125 S.Ct. 1536(plurality opinion) (relying on multiple considerations). If Griggsalready answered the question for all statutes (even those that do not use effects language), Smithis inexplicable.

Tr. of Oral Arg. 44-45 ("Community A wants the development to be in the suburbs. And the next state, the community wants it to be in the poor neighborhood. Is it your position ... that in either case, step one has been satisfied[?] GENERAL VERRILLI: That may be right").